# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br>5562 Philadelphia Street, Suite 213, Chino, California | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 8:21-MJ-00763

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-2

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 371, 1347, 1349, 1956 | Conspiracy; Health Care Fraud; Conspiracy to Commit Health Care Fraud; Laundering of Monetary Instruments |
| 42 U.S.C. § 1320a-7b | Illegal Remuneration for Health Care Referrals |

The application is based on these facts:

See attached Affidavit

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

SA Sina Silvey, HHS-OIG-OI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: Santa Ana, CA_____     Honorable Karen E. Scott, United States Magistrate Judge
_____
*Printed name and title*

AUSA: B. Marrett (x3505)

## **AFFIDAVIT**

I, Sina Silvey, being duly sworn, declare and state as follows:

### **I.   INTRODUCTION**

1.      I am a Special Agent ("SA") with the United States
Department of Health and Human Services, Office of Inspector
General, Office of Investigations ("HHS-OIG-OI") and have been so
employed since March 2004.  I am currently assigned to the Los
Angeles Regional Office.  As part of my initial training as a SA,
I graduated from the Criminal Investigator Training Program at the
Federal Law Enforcement Training Center in Glynco, Georgia in July
2004.  Currently, my duties include investigating fraud, waste,
and abuse within the over three hundred programs under the
Department of Health and Human Services ("HHS"), with the majority
of time spent on Medicare fraud investigations.  I have received,
and continue to receive on an ongoing basis, training specifically
related to criminal health care fraud investigations.

2.      In the course of this investigation and my
investigation of other health care fraud schemes, I have:

          a.   interviewed numerous persons, including witnesses
     and law enforcement officers;

          b.   reviewed numerous records and pertinent data;

          c.   read interviews and other reports written by
     other law enforcement officers; and

          d.   become familiar with the manner and means by
     which health care fraud schemes are operated.

3.      I am working jointly with SA LaShae Gayle ("SA Gayle")
of the Federal Bureau of Investigations ("FBI"), SA Trung Dang

("SA Dang") of the FBI, and Investigator Jason Grumet
("Investigator Grumet") of the California Department of Healthcare
Services ("DHCS") in the investigation of the subjects of this
affidavit.

## II.  <u>PURPOSE OF AFFIDAVIT</u>

4.    This affidavit is made in support of an application
for a warrant to search Meridian Hospice Care, Inc. (hereinafter
"MERIDIAN"), A's Hospice dba Doctors Hospice Southern California
(hereinafter "A'S") and Doctor's Home Health Southern California,
Inc (hereinafter "DOCTOR'S") for violations of Title 18, United
States Code, Section 1349 (Conspiracy); Title 18, United States
Code, Section 1347 (Health Care Fraud); and Title 42, United
States Code, Section 1320a-7b (Illegal Remunerations for Health
Care Referrals); Title 18, United States Code, Section 1956
(Laundering of Monetary Instruments).

5.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested warrant and does
not purport to set forth all of my knowledge of or investigation
into this matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.

## III.  <u>PREMISES TO BE SEARCHED</u>

6.    The premises to be searched are the business offices
of Meridian Hospice Care, Inc ("MERIDIAN") located at 5562

Philadelphia Street, Suite 210, Chino, California 91710 ("SUBJECT
PREMISES 1"); Doctor's Hospice of Southern California, Inc. dba
A's Hospice ("A'S") located at 5562 Philadelphia Street, Suite
213, Chino, California 91710 ("SUBJECT PREMISES 2"); and Doctor's
Home Health Southern California, Inc. ("DOCTOR'S") located at 5562
Philadelphia Street, Suite 216, Chino, California 91710 ("SUBJECT
PREMISES 3"), which are described in detail in Attachments A-1, A-
2, and A-3, which are incorporated herein by reference.
Collectively, SUBJECT PREMISES 1, SUBJECT PREMISES 2, and SUBJECT
PREMISES 3 are referred to herein as the "SUBJECT PREMISES".

## IV.   VEHICLES AND PERSONS TO BE SEARCHED

7.      The vehicles and persons to be searched are the person
of Gordhan Patel ("PATEL"); the person of Felisa Ann Abbott
("ABBOTT"); the person of Jackielyn Clemente ("JACKIE"); the
vehicle described as a 2021 Honda sedan with California license
plate 8UGP695 and vehicle identification number IHGCV2F93MAO07168
("SUBJECT VEHICLE 1"); and the vehicle described as a 2006 Lexus
sedan with California license plate 8LPY979 and vehicle
identification number JTHBK262065015440 ("SUBJECT VEHICLE 2").
The persons and vehicles to be searched are described in detail in
Attachments A-4, A-5, and A-6, which are incorporated herein by
reference.

## V.    ITEMS TO BE SEIZED

8.      The items to be seized during the search of the
SUBJECT PREMISES, which there is probable cause to believe
constitute evidence and instrumentalities of violations of Title
18, United States Code, Section 1349 (Conspiracy); Title 18,

United States Code, Section 1347 (Health Care Fraud); Title 42, United States Code, Section 1320a-7b (Illegal Remunerations for Health Care Referrals), and 18 U.S.C. § 1956 (Laundering of Monetary Instruments) are described in Attachments B-1, B-2, B-3, and B-4 which are incorporated herein by reference.

## VI.   BACKGROUND INFORMATION REGARDING MEDICARE BENEFITS

9.      Medicare is a federal health insurance program for individuals 65 years of age and older, certain younger people with disabilities, and people with End-Stage Renal Disease.  Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

10.      The Centers for Medicare & Medicaid Services ("CMS") is the federal agency that runs the Medicare Program.  CMS is a branch of the Department of Health and Human Services ("HHS").  Medicare is paid for through two trust fund accounts held by the U.S. Treasury.

11.      Individuals enrolled into Medicare are referred to as Medicare beneficiaries ("beneficiaries") and are assigned a unique health insurance claim number ("HICN") and/or Medicare Beneficiary Identifier ("MBI").

### A.   Medicare Enrollment for Providers

12.      All physicians, as well as eligible professionals as defined in Section 1848(k)(3)(B) of the Social Security Act, (collectively "providers"), must complete a Medicare enrollment

application[1] to enroll in the Medicare program, receive a Medicare billing number, and bill for services rendered to Medicare beneficiaries.  Providers must establish a National Provider Identifier[2] prior to submitting a Medicare enrollment application.

13.    The submission of a Medicare enrollment application requires the provider agree and adhere to all Medicare program requirements and applicable laws including, but not limited to, the following:

a.    The provider will not misrepresent or falsify any information on the Medicare enrollment application.

b.    The provider will not submit false or fraudulent claims for payment by Medicare.

c.    The provider will not submit claims or claims with underlying transactions in violation of such laws and regulations to include the Anti-Kickback Statute.[3]

---

[1] Medicare enrollment applications can be submitted electronically through the Provider Enrollment, Chain and Ownership System ("PECOS") or with the appropriate hardcopy CMS-855.

[2] The National Provider Identifier ("NPI") is a unique 10-digit identification number for covered health care providers. Covered health care providers, all health plans, and health care clearinghouses must use the NPIs in the administrative and financial transactions adopted under the Health Insurance Portability and Accountability Act ("HIPAA").

[3] The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), is a criminal law that prohibits the knowing and willful payment of "remuneration" to induce or reward patient referrals or the generation of business involving any item or service payable by the Federal health care programs (e.g., drugs, supplies, or health care services for Medicare or Medicaid patients). Remuneration includes anything of value and can take many forms besides cash.

**B.   Medicare Claim Submission**

14.    Providers can submit Medicare claims electronically pursuant to an Electronic Data Interchange ("EDI") enrollment or with the appropriate hardcopy claim submission form.  Claims submitted to Medicare must contain the following: beneficiary's name, date of birth, and HICN or MBI; the date of the service; current procedure terminology ("CPT")[4] code; diagnosis code; and the physician's name, Medicare number, and NPI number of who prescribed or ordered the service.  A provider submitting a claim to Medicare for payment must agree and adhere to the following:

a.    The provider will be responsible for all claims submitted to Medicare for payment.

b.    The provider will only submit claims to Medicare for beneficiaries who have given their written authorization to do so.

c.    The provider will submit claims that are accurate, complete, and truthful.

d.    The provider will retain all original source documentation and medical records for claims submitted to Medicare for at least 6 years and 3 months after the claim is paid.

**C.   Medicare Payments to Providers**

15.    Providers most commonly receive payments from Medicare electronically pursuant to an Electronic Funds Transfer Authorization Agreement ("EFT") also known as a CMS-588 form.  The

---

[4] CPT is a medical code to report medical, surgical, and diagnostic procedures and services.

EFT contains the routing number and account number for Medicare to send payments for claims submitted by the provider.

        **D.   Hospice Care Under Medicare**

16.   Hospice care[5] is a benefit under the hospital insurance program, Medicare Part A.  To be eligible to elect hospice care under Medicare, a beneficiary must be entitled to Medicare Part A and be certified as being terminally ill.  A beneficiary is considered to be terminally ill if the medical prognosis is that the beneficiary's life expectancy is 6 months or less if the illness runs its normal course.  The Medicare hospice benefit is only covered by a Medicare certified hospice.

17.    The hospice admits a beneficiary only on the recommendation of the medical director in coordination with the beneficiary's attending physician (if any) and only when the beneficiary elects hospice care.

18.   The hospice must obtain written certification[6] of terminal illness for each benefit period, even if a single election continues in effect.  A complete written certification must include: the beneficiary's medical prognosis is a life expectancy of 6 months or less if the terminal illness runs its normal course; specific clinical findings and other documentation supporting a life expectancy of 6 months or less; the signature(s) of the physician(s), the date signed, and the benefit period dates

---

[5] Hospice care is for terminally ill individuals electing to not use life-prolonging medical services.

[6] Only a medical doctor or doctor of osteopathy can certify or re-certify an individual as terminally ill.  Nurse practitioners and physician assistants cannot certify or re-certify an individual as terminally ill.

that the certification or recertification covers; and a hospice physician or hospice nurse practitioner must have a face-to-face encounter with each hospice beneficiary prior to the beginning of the third benefit period, and prior to each subsequent benefit period.

19.    A beneficiary may elect to receive Medicare coverage for two 90-day periods, and an unlimited number of 60-day periods. If the beneficiary elects to receive hospice care, the beneficiary must file an election statement with the hospice.  Hospices obtain election statements from the beneficiary and file a Notice of Election with the Medicare contractor.  The election statement must include: the identification of the hospice; the beneficiary's acknowledgment that the beneficiary understands that certain Medicare services are waived;[7] the date of the election; the beneficiary's designated attending physician and the beneficiary's acknowledgment that the designated physician was the beneficiary's choice; and the beneficiary's signature.

20.    A beneficiary may revoke the election of hospice care at any time in writing.  A hospice cannot revoke a beneficiary's election.  In order to revoke the election of hospice care a beneficiary must file a signed statement that includes: the beneficiary's decision to revoke the hospice benefit; and the date the beneficiary revoked hospice.

---

[7] Upon electing the Medicare hospice benefit, the beneficiary waives the right to Medicare payment for any Medicare services related to the terminal illness and related conditions (i.e., the patient's prognosis) during a hospice election, except when provided by, or under arrangement by, the designated hospice or individual's attending physician if he or she is not employed by the designated hospice.

21.     Discharge from hospice can occur if the beneficiary:
decides to revoke the hospice benefit; transfers to another
hospice; dies; moves out of the hospice service area; or the
beneficiary's condition improves and is no longer considered
terminally ill.

### VII. <u>BACKGROUND INFORMATION REGARDING MEDI-CAL BENEFITS</u>

22.     I know from my training and experience, investigation
in this case, and from information provided to me from other
agents and officers in this investigation that the Medi-Cal
program is a state-administered program, funded by both the state
and federal governments, so it is also federally funded health
insurance program, as defined by 18 U.S.C. § 24(b), that operates
as described below:

a.     Medi-Cal provides coverage for essential medical
care and services for California's qualifying indigent, elderly,
disabled, and refugees.  These covered individuals are also
referred to herein as "beneficiaries" ("benes") or "patients."
Medi-Cal reimburses health care providers providing medically
necessary treatment and services to Medi-Cal beneficiaries.

b.     Medi-Cal is regulated by the California
Department of Health Care Services ("DHCS"), which promulgates
rules for the administration of the program.  DHCS authorizes
provider participation, determines beneficiary qualification,
and issues Medi-Cal eligibility cards to beneficiaries for their
use to obtain goods and services from Medi-Cal providers.

c.     Medi-Cal providers (such as physicians,
pharmacies, durable medical equipment suppliers, etc.)

participate in Medi-Cal on a voluntary basis and are not government employees. Beneficiaries present their Medi-Cal eligibility cards to the providers for goods and services. Providers typically photocopy these cards, which contain information such as the beneficiary identification number, name, and date of birth. This information enables providers to bill Medi-Cal for services and goods, including prescriptions, rendered by the provider to the beneficiaries.

        d.   Health care providers receive direct reimbursement from Medi-Cal by applying to Medi-Cal and receiving a Medi-Cal provider number. To obtain payment for services, an enrolled provider, using its unique provider number, submits claims to Medi-Cal certifying that the information on the claim form is truthful and accurate and that the services or goods provided were reasonable and necessary to the health of the Medi-Cal beneficiary. Claims are mailed or transmitted electronically by providers to DHCS's contracted fiscal intermediary, currently Electronic Data Systems, which processes claims on behalf of Medi-Cal. Once claims have been through an edits and audits review, then EDS informs DHCS and the State Controller's Office. The Controller's Office then sends payment to the provider in the form of a California State Warrant (similar to a bank check).

23.   Medi-Cal Managed Care provides high quality, accessible, and cost-effective health care through managed care delivery systems.

24.    Medi-Cal Managed Care contracts for health care services through established networks of organized systems of care, which emphasize primary and preventive care.  Managed care plans are a cost-effective use of health care resources that improve health care access and assure quality of care.

25.    Today, approximately 10.8 million Medi-Cal beneficiaries in all 58 California counties receive their health care through six main models of managed care: Two-Plan, County Organized Health Systems (COHS), Geographic Managed Care (GMC), Regional Model (RM), Imperial, and San Benito. Medi-Cal providers who wish to provide services to managed care enrollees must participate in the managed care plan's provider network.

26.    **Hospice Care Under Medi-Cal**

a.    Hospice care is a medical multidisciplinary care designed to meet the unique needs of terminally ill individuals.

b.    Hospice care is used to alleviate pain and suffering and treat symptoms rather than to cure the illness. Items and services are directed toward the physical, psychological, social, and spiritual needs of the patient/family unit. Medical and nursing services are designed to maximize the patient's comfort, alertness, and independence so that the patient can reside in the home as long as possible.

c.    Providers must enroll as a Medi-Cal Hospice provider. All claims are submitted using the UB-04 claim. For additional hospice billing procedures and claim form

instructions, refer to the appropriate Part 2 outpatient services manual.

        d.   Hospice providers may include the following:

           • Hospitals

           • Skilled nursing facilities

           • Intermediate care facilities

           • Home health agencies

           • Any licensed health provider who has been certified by Medicare to provide hospice care and is enrolled as a Medi-Cal hospice care provider

        e.   All services must be rendered in accordance with Medicare requirements.

## VIII.      STATEMENT OF PROBABLE CAUSE

### A.   Index of Subjects and Businesses

27.   MERIDIAN:  Meridian Hospice Care Inc. Hospice is a company owned by Gordhan Patel.  MERIDIAN is the business located at SUBJECT PREMISES 1.

28.   A'S: A'S Hospice dba Doctor's Hospice of Southern California is a company owned by Gordhan Patel.  A'S is the business located at SUBJECT PREMISES 2.

29.   DOCTOR'S: Doctor's Home Health of Southern California is a company owned by Gordhan Patel.  DOCTOR'S is the business located at SUBJECT PREMISES 3.

30.   PATEL: Gordhan Patel, owner of MERIDIAN, A'S and DOCTOR'S.  PATEL is the father of Dr. Nehal Patel.

31.   DR. PATEL:  Dr. Nehal Patel.  DR. PATEL is the son of PATEL and the top attending provider for MERIDIAN and DOCTOR'S.

32.    KOCKINIS:  Dr. Thomas Kockinis.  KOCKINIS is the top attending doctor for A'S.

33.    ABBOTT:  Felicia Abbott a.k.a. Lisa Abbott.  ABBOTT is the Office Business Manager for the businesses located at the SUBJECT PREMISES.  ABBOTT is married to Craig Abbott.

34.    CRAIG:  Craig Abbott.  CRAIG is married to ABBOTT.  CRAIG is a marketer for the businesses located at the SUBJECT PREMISES.

35.    JACKIE:  Jackielyn Clemente.  JACKIE is employed at the businesses located at the SUBJECT PREMISES.

**B.    Overview of the Scheme**

36.    Based on my training and experience, personal knowledge of the investigation, and information obtained from various law enforcement personnel and witnesses, as described in detail in Sections VIII.D and VIII.E below, there is probable cause to believe that PATEL through businesses located at the SUBJECT PREMISES has engaged in a scheme to fraudulently bill Medicare.  In general, the scheme is believed to operate as follows:

a.    PATEL paid marketer's, aka recruiters, cappers, or community liaisons to induce the referral of Medicare beneficiaries to enroll at the SUBJECT PREMISES, a violation of the Anti-Kickback Statute.

b.    PATEL and ABBOTT, who was introduced to the Confidential Human Source ("CHS")[8] as the Office Business Manager for the businesses located at the SUBJECT PREMISES, had multiple meetings with the CHS.  The meetings were audio recorded.  The following sub-paragraphs summarize what occurred during those meetings:

i.    PATEL and ABBOTT confirmed they paid marketers $500 to $750 by check per patient referral and per patient that was enrolled in either MERIDIAN and A'S, and up to $250 for a referral to DOCTOR'S.

ii.   PATEL and ABBOTT admitted that the businesses operating at the SUBJECT PREMISES paid other marketers for hospice and home health patient referrals.

iii.  ABBOTT admitted that her husband, known to agents as CRAIG, marketed patients for MERIDIAN and/or A'S. ABBOTT also admitted that CRAIG marketed part-time for DOCTOR'S. Based on the investigation to date, investigators believe CRAIG is one of the marketers working with the businesses located at the SUBJECT PREMISES.

iv.   ABBOTT admitted that the SUBJECT PREMISES is owned by PATEL.

---

[8] The CHS has worked with the government in the course of several related healthcare fraud and anti-kickback investigations as well as a separate tax fraud investigation. Information provided by the CHS has been trustworthy and corroborated.  The CHS has no criminal history but has entered a guilty plea to a single-count information charging Conspiracy to Defraud the United States, in violation of 18 U.S.C. § 371, in connection with a tax fraud scheme, in which CHS also received the benefit of a non-prosecution agreement for violations of 42 U.S.C. § 1320a-7b(b)(1)(A) committed between 2017 and 2019.

    v. PATEL confirmed that he approved all of ABBOTT'S decisions regarding business operations.

    vi. ABBOTT admitted that PATEL owns all the businesses located at the SUBJECT PREMISES.

    vii. ABBOTT admitted that marketers gathered patients' personal identifying information and insurance information and in turn, provided the information to the businesses located at the SUBJECT PREMISES.

    viii. ABBOTT admitted that DR. PATEL and KOCKINIS work for the businesses located at the SUBJECT PREMISES.  DR. PATEL and KOCKINIS are the top attending providers listed on the Medicare claims data for MERIDIAN, A'S, and DOCTOR'S.  A review of the Medicare claims data for MERIDIAN, A'S, and DOCTOR'S shows that KOCKINIS is the attending provider for 99.99% of the beneficiaries for A'S.  DR. PATEL is the attending provider for the remaining beneficiary for A'S, or .01%.  DR. PATEL is the top attending provider for MERIDIAN with 38.13% of the beneficiaries.  DR. PATEL is listed as the attending provider for 47.36% of the Medicare beneficiaries for DOCTOR'S.

    ix. ABBOTT admitted that she preferred Medicare patients over HMO patients because it's easier to get authorization from Medicare.

    x. ABBOTT admitted that she marketed and referred patients to the businesses located at the SUBJECT PREMISES.

37.     Commonly, the majority of MERIDIAN and A'S beneficiaries were not informed they were being enrolled into end of life hospice.  PATEL's marketers told multiple beneficiaries the services provided by MERIDIAN and A'S were palliative care[9] and not hospice care.

38.     Throughout the course of the investigation, over thirty beneficiaries and/or beneficiaries' representatives were interviewed.  Virtually all the beneficiaries and/or beneficiaries' representatives indicated the beneficiaries never had a terminal diagnosis or life expectancy of six months or less, which is a requirement for enrollment in hospice.  Examples of the Medicare/Medi-Cal beneficiaries interviewed are included in this affidavit from Paragraphs 71 to 106.

39.     Medicare documents listed PATEL as the owner of the SUBJECT PREMISES.

40.     PATEL is listed as the authorized signer on the signature card dated March 6, 2017, for a Wells Fargo Bank ("WFB") account for DOCTOR'S (described further in Section X.E).

41.     PATEL was listed as authorized signer on the signature card dated May 18, 2016, for a WFB account for MERIDIAN (described further in Section X.A).

42.     PATEL was listed as authorized signer on the signature card dated April 17, 2015, for a WFB account for A'S (described further in Sections X.B and X.D).

---

[9] Palliative care is for individuals who may or may not be terminally ill electing to use life-prolonging medical services.

### C.   Ownership

####    1.   <u>MERIDIAN Ownership</u>

43.    On October 14, 2021, I queried PECOS[10] for MERIDIAN'S, which showed the following: MERIDIAN's NPI was 1376964791; MERIDIAN's Medicare number was 921703; PATEL is listed as the only person with a "5% or Greater Direct Ownership Interest" of MERIDIAN'S as of April 27, 2016; and PATEL was the authorized official on the certification of Medicare documents submitted on August 1, 2016.

44.    PECOS listed one bank accounts for MERIDIAN with EFTs, including WFB account number 3911255598 ("MERIDIAN'S BANK").

45.    On or about June 22, 2017, Medicare granted MERIDIAN'S application to operate as a Medicare Provider and assigned MERIDIAN a National Provider Identification ("NPI") number of 1376964791.

####    2.   <u>A'S Ownership</u>

46.    On March 26, 2021, I queried PECOS for A'S, which showed the following: A's NPI was 1982043733; A'S Medicare number was 921507; PATEL is listed as the only person with a "5% or Greater Direct Ownership Interest" of A'S as of May 15, 2015; and PATEL was the authorized official on the certification of Medicare documents submitted on April 10, 2015.  ABBOTT is listed as an authorized official on the Medicare provider application as of February 15, 2017.  ABBOTT is also listed as the

---

[10] PECOS is the Medicare Provider, Enrollment, Chain and Ownership System.  The PECOS system is a database of providers who have registered with CMS. A NPI number is necessary to register in PECOS.  Providers must enroll in PECOS to avoid denied claims.

Operational/Managerial Control on the Medicare provider application as of September 1, 2017.

47.     PECOS listed one bank account for A'S with EFTs, including WFB account number 8152481613 ("A'S BANK 3").

48.     On or about July 22, 2016, Medicare granted A'S application to operate as a Medicare Provider and assigned A'S a National Provider Identification ("NPI") number of 1982043733.

### 3.   DOCTOR'S Ownership

49.     On November 2, 2021 I queried PECOS for DOCTOR'S, which showed the following.  DOCTOR'S NPI was 1205351749; DOCTOR'S Medicare number was 559079; PATEL is listed as the only person with a "5% or Greater Direct Ownership Interest" of DOCTOR'S as of January 10, 2017; and PATEL was the authorized official on the certification of Medicare documents submitted on March 15, 2019

50.     PECOS listed one bank account for DOCTOR'S with EFT, including WFB account number 5156775867 (hereinafter "DOCTOR'S BANK").

51.     On or about October 15, 2019, Medicare granted DOCTOR'S application to operate as a Medicare Provider and assigned DOCTOR'S a National Provider Identification ("NPI") number of 1205351749.

### D.   **Facts Establishing Probable Cause**

### 1.   Confidential Human Source

52.     CHS used an audio/video device provided by the investigative agencies to record CHS's interactions with ABBOTT, PATEL, and PATEL's employees.  The FBI provided draft transcriptions of the recordings.

53.    Prior to working for PATEL, JACKIE worked at another hospice provider where she met CHS.  CHS referred patients to this hospice provider.  When JACKIE began working for PATEL, JACKIE contacted CHS to inquire about CHS referring patients to the businesses located at the subject premises.

54.    On March 10, 2021, CHS was introduced to ABBOTT through JACKIE, ("JACKIE") a mutual acquaintance and employee at the SUBJECT PREMISES.  JACKIE indicated to CHS that ABBOTT would pay CHS kickbacks for patient referrals to the businesses identified as SUBJECT PREMISES.

55.    On March 10, 2021, CHS met in person with ABBOTT and JACKIE at the SUBJECT PREMISES.  Below is the detailed transcription of portions of their conversation:

        a.    CHS: "So how many patient do you have a day week or a month . . . I would just say a month, how many patient do you admit a month money coming in patient new admission."

        b.    ABBOTT: "Oh well if we're talking about right now we're really getting busy right now so with home health is still kind of slow because we really haven't really market for the home health and this is pretty new so we're just introducing the company introducing home health now that you know to the to everybody right now you know so we're introducing this company right now that we have a home health."

        c.    CHS: "But before that you always been hospice?"

        d.    ABBOTT: "Yeah, we always been a hospice and we added home health and I like to build the home health (and you know) and if we could also work with just the hospice you know,

fortunately."

　　　　　e.　ABBOTT: "I'm the administrator."

　　　　　f.　CHS: "So if I refer patients do I talk to you or

　　　　　g.　ABBOTT: Yea you just go direct to me just go
directly for any, any patients that you're referring."

　　　　　h.　CHS: "Do you have any other marketer work for
you?"

　　　　　i.　ABBOTT: "We have one marketer right now that's
working with us now and but majority where he gets all his
patients from are the hospital."

　　　　　j.　CHS: "Does he work in the hospital?"

　　　　　k.　ABBOTT: "No."

　　　　　l.　CHS: "Oh, how does he get the patients?"

　　　　　m.　ABBOTT: "Well you know, through friends . . . if
you're able to get in it's really good.  But he does get
patients . . . most of them are palliative and hospice.  So our
home health is kinda like getting behind but we work with a lot
of Kindreds[11] we work with Loma Linda, we work with Riverside, so
that's where we're getting quite a lot all our patients from."

　　　　　n.　CHS: "Is the owner a doctor . . . Dr. Patel?"

　　　　　o.　ABBOTT: "Actually, Dr. Patel is the son of the
owner.  Dr. Patel is one of our physicians and then we have Dr.
Kockinis, we have quite a lot of doctors that works for us . . .
I have two doctors that are medical directors and then I have a
lot of attending physicians that sees patients for us".

---

　　　　[11] Kindred Healthcare is a post-acute healthcare services
company that operates long-term acute-care hospitals and
provides rehabilitation services across the United States.

p.   ABBOTT: "So and we're just trying to, you know, build the company and kind of get marketers out there to help us out."

q.   ABBOTT: "So and then we're just seeing like right now our home health is only . . .we barely have anything."

r.   CHS: "With hospice, how do you work together if I have a patient that refer to you with hospice?  What do you do for me things like that?"

s.   ABBOTT: "Usually whenever we get a referral from any marketer, so once they refer the patients to us, so what we do is we information is given to us by you that you know, their name, their social security, their date of birth, the whole information of insurance, okay.  So now, you give us the goal to contact the family.  So we contact the family, then we send our nurses, our RN, our MP or our social worker, because all overall all my all my staff knows how to explain benefits.  We were all trained how to explain benefits.  So we believe that somebody explained the benefits to them, and why they agree and once they are interested, then we qualify them.  But we always run the eligibility first before we admit the patient."

t.   ABBOTT: "Every marketer is different.  Every marketer is different on how they have the sometimes they wanted per patient.  Sometimes it's how many they bring in weekly or . . ."

u.   CHS: "What do you what do you prefer?"

v.   ABBOTT: "It all depends.  It all depends on what works for both of us.  And what would be the best."

        w.   CHS: "How about we start out with per patient first?"

        x.   ABBOTT: "Okay."

        y.   CHS: "How much do you compensate other people per pa…?"

        z.   ABBOTT: "Well for hospice the compensate 5 to 750."

        aa.  CHS: "500 to 700 per patient for hospice?"

        bb.  ABBOTT: "Yes, one time."

        cc.  ABBOTT: "But that's only what we call the per referral, we also have a with a way where you for hospice there's a certain amount of patients you bring in, then you get paid . . . a salary amount."

        dd.  ABBOTT: "Because they bill on their own, you know what I mean, palliative doctors and NP's they bill part B."

        ee.  ABBOTT: "The range that we pay here is 750."

        ff.  CHS: "Ok so should we just go with 750."

        gg.  ABBOTT: "Ok let's just go with 750."

        hh.  ABBOTT: "You know, we just get patients, you know, it's all word of mouth, you know, but now, you know, the way home health now and the way hospice run, it's all by referrals by referrals, hey, people need make to make money. That's part of their job marketing is my, you know, I do it sometimes I do market and you know and I do refer patients here, you know but it's just, I just do it, you know, but right now, we wanted to, we have a goal . . . how many patients we need you know, and the goal is we need to accomplish.  But it's not easy

to market, you know, I can't go out and work and handle three companies and market at the same time.  It's not going to happen."

       ii.  ABBOTT: "So my husband do help us out with marketing, but it's all hospice patients, not even a home health.  So we really, like I said, we haven't really touched anything in home health, nothing."

       jj.  ABBOTT: "I want to tell you I want to be very very honest with you when it came when it came to the home health . . . they are they are two marketers that they work with and one is only part time which is my husband.  Okay. And then one."

       kk.  ABBOTT: "So for home health, they're only getting 250."

       ll.  CHS: "That $250 is HMO?"

       mm.  ABBOTT: "No, just $250 flat per referral."

       nn.  ABBOTT: "Yeah, so we have seven patients right now . . . for home health."

       oo.  ABBOTT: "I would prefer, in honesty, I would prefer to get Medicare patients from home health because we are having quite a lot of such problem trying to get an authorization."

       pp.  CHS: "From HMO?"

       qq.  ABBOTT: "Yes."

       rr.  ABBOTT: "And that's what we're trying to market also it's not just HMO it's, we're also tryna market for the Medi-Cal."

ss.   CHS: "So do you want me to admit HMO patient or just Medicare?"

tt.   ABBOTT: "If we could work with the Medicare, but then you know, usually what she has to do is get the authorization before we could even admit the patient.  When you refer the patient I don't wanna lose the patient."

uu.   JACKIE: "I need Medicare patients."

56.   On March 24, 2021, CHS received an email from PATEL from the email account doctorshomehealthsocal@gmail.com, with one attachment containing the two Referral Agreements.

57.   On October 5, 2021, I reviewed the Referral Agreements and learned the following:

a.   The first agreement is between "Meridian Hospice Care, Inc. and Doctors Hospice Southern California, Inc." and the CHS, located at "5562 Philadelphia Street Suite 210/Suite 213 Chino, CA 91710."  The contract was entered into on March 24, 2021.

i.   The agreement states the compensation is "$750 for each successful referral, where a successful referral is defined as a referral that becomes a client/customer of Company."

ii.   The "company is in the business of Hospice Agency."  The "affiliate is in a position to refer potential clients/customers."

iii. The company will not pay for an unsuccessful referral.  "An unsuccessful referral is defined as a valid referral candidate that does not become a client/customer of

Company through no fault of Affiliate or Company; and a valid referral candidate is a potential client/customer that meets the specifications."

        iv.  "Upon the Effective Date of this Agreement, Affiliate may, from time to time, refer potential client/customers to Company.  Company will pay Affiliate a fee for these referrals."

      b.  The second agreement is between "Doctors Home Health Southern California, Inc." and the CHS, located 5562 Philadelphia Street Suite 216.  The contract was entered into on March 24, 2021.

        i.  The agreement states the compensation is "$500 for each successful referral/$250 for a recertification, where a successful referral is defined as a referral that becomes a client/customer of Company."

        ii.  The "company is in the business of Home Health Agency.  Affiliate is in a position to refer potential clients/customers to Company."

        iii. The company will not pay for an unsuccessful referral.  "An unsuccessful referral is defined as a valid referral candidate that does not become a client/customer of Company through no fault of Affiliate or Company; and a valid referral candidate is a potential client/customer that meets the specifications."

        iv.  "Upon the Effective Date of this Agreement, Affiliate may, from time to time, refer potential

client/customers to Company.  Company will pay Affiliate a fee
for these referrals."

58.    On March 26, 2021, CHS was introduced to PATEL through
ABBOTT.  The CHS met telephonically with ABBOTT and PATEL to
discuss the Referral Agreements.  Below is a transcription of
portions of the call.

a.    "CHS: So am I will I be signing with Mr. Patel
directly?  Or Lisa or Jackie?  I will sign but I just want to
know who I'm signing with."

b.    PATEL: "You will be signing with our
administrator Lisa.  She signs all the contracts on behalf of
the company."

c.    CHS: "So, Mr. Patel?  So are you aware of and,
you know, what we discussed in terms of the referral fee?  And
you approved Lisa for for the amount and everything?"

d.    PATEL: Yes, I do.

e.    PATEL: "Good question.  I'm glad you asked.  This
has been authorized to sign the contract on behalf of the
company.  So she signed the contract with the insurance
companies who signed the contract with who was the other
boarding care she sign the contract with the nursing home
physical therapy the rehab center.  So she's authorized person,
but I assure you that I do, take the responsibility.  And, and
make sure that I guarantee the payments that were made on time
that I can guarantee on behalf of Lisa, and, and me, and if you
needed something to write down, I'll be happy to do that.  This
could not be an issue about that.  In fact, in fact, we have

been doing so regularly for everyone we have any, any issue in
making sure that you're being taken care of for your efforts,
you know."

     f.    PATEL: "[CHS first name], other thing is this
some other agencies that they might have been working, they have
maybe the only one source of income or maybe only one source of
entity, which may be home health or hospice.  In our case, we
are involved in the multiple medical services.  And I'm sure
Lisa probably told you, we own the 99-bed boarding care in
Fontana as well so we can put the patient there is assisted
living.  So we put a lot of patients out there from the hospital
because hospitals like to discharge the patient and sometimes
they don't have the places and yes you know how difficult it is
to find a place to place to put the patient.  But we have no
issue with a call us in two hours and the patient out of a NA
facility in Fontana, which is a 99-bed.  We also have a two
separate home health agency I mean hospice agencies.  We also
have the home health agency.  We also have the urgent care in
Covina.  We also have the family practice in Covina and we have
a palliative care consulting physician group so we are in a
multiple medical businesses we are just not only on a one, then
we depend on the one side so we make sure that we support all of
our agencies and make sure that's financially strong and viable.
We don't have that issue . . . so I just wanted to let you know
what our background.  I'm telling you the medical side of it,
then I'm involved into the hotel motel business in real estate
for the last 50 years.  And we have a large portfolio of the

hotel shopping centers we do.  So we are very strong financially, you know, we are not depend on the bank, we don't have any loan.  So we got multiple sources and we are in business for, for for the, for the IA John Holmes in Denver, Denver, Colorado, which is about a $20 million project.  So that gives you the idea of or ability to enter what kind of a cash level you're working with, and what I look forward is to grow with you and help you to grow also on top of that, and right, not only grow ourself, but help you to grow with us also. That's our goal.  I mean, we even train the palliative physicians from a CFO, I'm sure you've probably heard about the Dr. Patel.  So you work with Kaiser for over 20 years, he is a very experienced and well connected we have a team of doctors on our list.  So we can meet the needs of your patients anytime, any complicated cases, we take care of it.  We have What about three of NP's now or we have two NP's Lisa?  You know that there are plenty of nurses and we our next goal is to build up the business with your help into the Vietnamese.  And by the way, Dr. Vu and Dr. Patel they know each other also.  They were doing the residency I think, together at Martin Luther King.  So it's a close relationship all the way around.  [CHS first name] so you don't need to worry about your payment, you will never ever lose a single penny from us."

      g.   CHS: "Okay, great.  Great.  Thank you.  And before before I sign a contract, so I worked with several company in the past so everyone's do a little bit different . . . Another company I worked with, we do have a contract, but the

way they prepare the contract a little bit different, instead of saying like referrals fee on here per patient, don't do the referral fee by patient, but they would say something about I'm doing the marketing and liaison."

      h.   PATEL: "That's exactly how we would do it that's exactly."

      i.   CHS: "Yeah, they don't specify."

      j.   PATEL: "No, no, no, no, we will be doing either as a marketing fee, or is it consulting fee."

      k.   ABBOTT: "OK meaning I should go ahead and reword it."

      l.   PATEL: "We don't do that.  Yeah.  Give you an idea from our company.  We have about three or four marketers like you are, and all of them we put down as a marketing or consulting services."

      m.   PATEL: "(CHS first name) but it might be beneficial to think that if you're your own company, you will save a lot of things taxes, you are able to do a lot of write up in your own case . . . we can help you do that."

      n.   CHS: "But we have our understanding that's why we have a meeting today to clarify that I do get paid per patient."

      o.   PATEL: "Yes, correct . . . as long as you understand we can keep it on the background it doesn't have to be part of the contract, we can we can Lisa we can write in contract that we are hiring her for the marketing services, and she'll get paid for her invoice submitted to the company.  So it

doesn't need to mention any amounts or anything.  And you know
what the rates are [CHS first name]."

       p.    PATEL: "What it means is 750 for a successful
admission means that they are eligible for hospice, given the
(inaudible) if they there for three hours or three days.  You
get paid."

       q.    PATEL: "With hospice patients we accept Medi-Cal
as well as Medicare or the private hospice."

       r.    CHS: "No, up to you like I like I said, I can
sign this contract, or you can revise it and I can signed it,
it's up to you, but we all understand like it's per patient."

       s.    PATEL: "Absolutely, there's no misunderstanding."

59.   On March 26, 2021, PATEL sent an email from his email
account, doctorshomehealthsocal@gmail.com, with an attachment
named "Consulting Agreement 32621" which included revised
contracts for MERIDIAN and A'S and DOCTOR'S based upon their
telephonic conversation on March 26, 2021.

60.   On October 5, 2021, I reviewed the email and its
attachment.  The attachment contained two contracts and learned
the following:

       a.    The first "Consulting Agreement" is between the
CHS and "Doctors Home Health Southern California" located at
"5562 Philadelphia Street Suite 216 Chino, CA 91710."

       b.    "Company is in the business of home health
agency. Affiliate is in a position to refer potential
clients/customers to Company."

      c.   The arrangement is for the affiliate to refer potential clients/customers to the Company while the Company's arrangement is to pay the Affiliate a consulting fee for marketing services.

      d.   The compensation wording states, "Company shall pay consulting fee per patient, where a successful admission is defined as a marketing service that becomes a client of Company."

      e.   The contract is signed by ABBOTT on March 26, 2021.

      f.   The second "Consulting Agreement" is between the CHS and "Meridian Hospice Care, Inc. and Doctor's Hospice Southern California, Inc." located at "5562 Philadelphia Street Suite 210/213 Chino, CA 91710."

      g.   The compensation wording states, "Company shall pay consulting fee per patient, where a successful admission is defined as a marketing service that becomes a client of Company."

      h.   The contract is signed by ABBOTT on March 26, 2021.

   61.   On May 5, 2021, the CHS sent an email to doctorshomehealthsocal@gmail.com with the agreements between the CHS and "Meridian Hospice Care, Inc. and Doctor's Hospice Southern California, Inc." and "Doctors Home Health Southern California." The CHS signed the documents on May 4, 2021. The documents were attached to the email as a single attachment

62.    On May 11, 2021, the CHS sent an email to doctorshomehealthsocal@gmail.com regarding Medicare beneficiary K.N., with the following message:

a.    "Hello Mr. Patel, Here is the new Pt.  Please check for eligibility."  Attached to this email were photos of K.N.'s Medicare Health Insurance Card and K.N.'s California Senior Identification Card.

63.    On May 11, 2021, CHS sent the following text messages to Jackie:

a.    "Is Pt ok to admit?"  "I don't have md order" "You said you can take care of that right?"

64.    On May 12, 2021, Jackie responded by text message:

a.    "Yeah that's fine I love me some fission I'll send a doctor and I will get a order in an HNP do you know if the patient has been in the hospital lies when was the last time she was hospitalized anything like that."

65.    On July 8, 2021, CHS met with ABBOTT and PATEL at the SUBJECT PREMISES to pick up payment for the referral of MEDICARE beneficiary, K.N.  The meeting was audio/video recorded.  A portion of the meeting is transcribed below:

a.    ABBOTT: "I know that the S.O.C[12] $500 on the recert is $250.  That's what we discussed."

_____

[12] Based on my training and experience, I know that "SOC" stands for start of care.  Start of care is when a patient is initially signed up for hospice services. I also know that "Recert" refers to a recertification of a patient.

b.   CHS: Okay.  "Okay.  Yeah.  So that means I will get $500 for the S.O.C.  And when you recert the patient I will get $250 from K.N. as well."

c.   ABBOTT: "Yes."

d.   PATEL: "That is correct.  Whatever the commitment was . . . "

e.   PATEL: "Of course, a lot of our referrals they come basically from hospitals.  You know and also from the doctors.  Practicing doctors.  But then there are some they come like people like you and the hospice.  But we have the NP[13] that go and they evaluate and make sure that hospice appropriate and when they say that they hospice appropriate than they get admitted into the.  Or let's say that if they need some help though temporarily we'll take them but we'll follow up with the np to make sure or md to make sure they're appropriate."

f.   PATEL: "Any fresh hospice that you refer let's say for example you have somebody they come directly to hospice they also get paid at $750.00.  You'll find we are very flexible."

g.   ABBOTT: "We love to pay on time."

h.   PATEL: "I love to pay within three days."

i.   PATEL: "So also what the deal is make sure with Jackie we got the if we got the recert then you can cut the check same time I don't want her to come back again for you know so as soon as we have it."

---

[13] Based on my training and experience "NP" stands for nurse practitioner.

j.   ABBOTT: "Well we can always mail it too."

k.   PATEL: "Or we can mail it yes."

l.   PATEL: "You see a lot of companies [CHS first name] they operate when they get paid you get paid you follow we don't do that ok we don't do that we pay you and then we wait for payment for our services so we don't do that that's the reason what she say in our case three days is the maximum once you confirm."

m.   PATEL: "See, remember the payment to the vendors is no different to payment to the rent because if you are behind one month it's difficult to pay two months more difficult to get three months and impossible to the four months.  Same thing if I owe you something for this month more difficult to pay you the second month third and fourth month, I cannot pay you.  See, that's why we don't wait til we get the reimbursement we pay. We have a lot of our own personal investment.  Also, this is not the only business we have here.  We got multiple businesses.  So this is maybe 20 percent of our business.  Ok we have urgent care, we have family practice, we have boarding care, and we have 11 motels, and we have shopping centers, we have medical buildings, (inaudible) we buy lands, we build townhouse all throughout the country so this is like a 15 20 percent of our business, so we are not dependent on one like unlike some of the other agencies.  We have access to capital so we can move the capitals around and make sure the company (inaudible) and the company they prosper.  And we get we start any company we start with the goal of making it successful whatever it takes."

n.  CHS: "This is just for the S.O.C. Correct?"

o.  ABBOTT: "Correct."

p.  CHS: "Okay. We didn't put the patient name on here."

q.  ABBOTT: "No, you know didn't. Next time I will."

r.  CHS: "Yeah.  Can you just memo to put the patients so we know which patient we paid for K.N?"

s.  ABBOTT: "And then what I've been doing with every patient I get for home health I do a spreadsheet so I always put the date so with yours once we start getting more and more everything will be in a spreadsheet and then when you send your invoice I match it because I'm the one that will be handling that . . . invoices just to match it then I approve it."

t.  CHS: "So the same thing I will just send you the to verifi for verify like the Medicare card and the Medi-Cal card right?"

u.  ABBOTT: "Medicare Medical and then their ID and their driver's license at all times and the date of birth and social security because when we run it sometimes."

v.  CHS: "Oh usually I don't give social security because they don't give the social they get the Medicare care."

w.  ABBOTT: "Yea but if we don't then sometimes the Medicare card with the names sometimes you know how . . . especially with the Vietnamese name they have the first name it's supposed to be the last name right . . . so when we run it in the system it makes it hard for us so and then what happens is . . . so we're gonna need at least the date of birth and

social security majority of the time because we have to input them in the system . . . the system will not accept anything without the social security."

66.    After the meeting ended, the CHS provided agents with the check.  Below is the copy of the check provided by the CHS:



67.    A review of the updated DOCTOR'S Medicare claims data for claims through August 31, 2021, showed that DOCTOR'S had not submit claims for Medicare beneficiary K.N.

**E.    INFORMATION PROVIDED BY MEDICARE BENEFICIARIES**

68.    Agents interviewed over 30 Medicare and Medi-Cal beneficiaries, or their immediate family members, who were enrolled in MERIDIAN and A'S.  Beneficiaries were identified

because they had common addresses or their names were listed on checks payable to marketers, including CRAIG.  Dates of service for these Medicare beneficiaries ranged from August 2018 to September 2020.  For all of these beneficiaries, MERIDIAN and/or A'S submitted claims to Medicare and/or Medi-Cal for hospice services that the beneficiaries did not qualify for.

69.    Medicare beneficiaries from DOCTOR'S were not interviewed as of this date.  According to the Medicare claims data as of August 31, 2021, DOCTOR'S had billed for 19 Medicare patients.  During the in-person meeting with the CHS on March 10, 2021, ABBOTT admitted that DOCTOR'S is a newer company and they only had seven patients at the time.  This affidavit includes descriptions of information provided to agents by 15 of these beneficiaries, whose statements were generally representative of those made by all interviewed.

70.    In addition, agents interviewed PCPs for 8 of these Medicare/Medi-Cal beneficiaries who were enrolled in hospice by MERIDIAN and/or A'S.  This affidavit includes descriptions of information provided to agents by seven of these PCPs.  None of the PCPs were aware that their patients had been enrolled in hospice services.  From my training and experience, it is indicative of fraud for a patient to be admitted to hospice without the knowledge or agreement of their PCP.

1.    Medicare Beneficiary L.W. (MERIDIAN)

71.    On June 23, 2021, FBI SA Gayle and I interviewed Medicare beneficiary L.W.  The following is summary of the interview:

      a.   L.W. was introduced to MERIDIAN by a man at a table set up in the front office of his apartment complex.  L.W. was shown a photo of CRAIG who he identified as the man at the table.  L.W. did not think he qualified for hospice, but CRAIG told L.W. that he qualified as a special circumstance due to his hernia.

      b.   L.W. identified DR. PATEL as the doctor who visited him while he was under MERIDIAN's care.

72.   I reviewed Medicare claims data extracted on June 21, 2021 (hereinafter "MERIDIAN HOSPICE DATA"), from CMS' Business Objects – One Program Integrity database.  According to MERIDIAN's HOSPICE DATA, L.W. was enrolled with MERIDIAN from July 22, 2019 to December 6, 2020, with a diagnosis of atherosclerotic heart disease of native coronary artery with unstable angina pectoris. The total amount billed to Medicare by MERIDIAN for L.W. was approximately $111,151.26 and the total paid by Medicare for those claims was approximately $90,874.64.

      2.   Medicare Beneficiary E.B. (MERIDIAN)

73.   On July 1, 2021, FBI SA Gayle and DHCS Investigator Grumet interviewed E.B.  E.B. was initially identified by the Medicare claims data.  The following is a summary of the interview:

      a.   E.B. was introduced to MERIDIAN when he met "Craig" in the grocery store.  E.B. was shown a redacted DMV photo of CRAIG who he confirmed was the man he met in the grocery store.  E.B. understood that hospice care meant end of

life care but indicated that he did not have any serious medical conditions.

     b.    E.B.'s primary care physician is Dr. Clifford Sussman.  Dr. Sussman was not involved in MERIDIAN providing services.  E.B. was never treated by a doctor from MERIDIAN; however, a doctor in Orange County approved a prescription for E.B.  E.B. does not suffer from heart disease which was listed as his primary diagnosis in the Medicare claims data.

74.    According to MERIDIAN's HOSPICE DATA, E.B. was enrolled with MERIDIAN from October 2, 2018 to July 30, 2020, with a diagnosis of atherosclerotic heart disease of native coronary artery without angina pectoris.  The total amount billed to Medicare by MERIDIAN for E.B. was approximately $148,121.29 and the total paid by Medicare for those claims was approximately $118,025.95.

75.    On August 12, 2021, Investigator Grumet and I interviewed E.B.'s PCP, Dr. Clifford Sussman.  The following is a summary of the interview:

     a.    E.B. was under the care of Dr. Sussman until August 2019.  E.B. switched doctors because he moved and did not drive.

     b.    Dr. Sussman was not aware of E.B. having heart disease.  Dr. Sussman indicated that based on E.B.'s patient file he did not qualify for hospice services.

     c.    E.B. saw Dr. Sussman four times between October 2018 and August 2019.  Dr. Sussman described these visits as

"regular check-ups."  He did not find any diagnosis that would allow E.B. to qualify for hospice services.

     d.   Dr. Sussman searched E.B.'s entire medical record in the medical group system and did not find any referrals for hospice services.

     3.   <u>Medicare Beneficiaries E.A. (MERIDIAN)</u>

76.   On July 1, 2021, FBI SA Gayle and DHCS Investigator Grumet interviewed E.A. and her fiancé J.R.  The following is a summary of the interview:

     a.   E.A. was first introduced to MERIDIAN through a presentation in the community lunchroom.  J.R. identified a redacted DMV photo of CRAIG as the "main guy" who gave the presentation.  E.A did not recognize the name "Dr. Nehal Patel." Dr. Rupal Shah is E.A.'s primary care physician and listed as the attending provider on the MERIDIAN Medicare claims data.

     b.   E.A. received services from MERIDIAN.  E.A. believes Dr. Shah was aware that E.A. was receiving hospice services from MERIDIAN.  MERIDIAN provided a representative to come to her home on one or two occasions per week to clean and take her blood pressure.

     c.   E.A. thought hospice was for end of life care.

77.   According to MERIDIAN's HOSPICE DATA, E.A. was enrolled with MERIDIAN from February 26, 2018 to July 30, 2020, with a diagnosis of chronic obstructive pulmonary disease, unspecified.  The total amount billed to Medicare by MERIDIAN for E.A. was approximately $118,899.11 and the total paid by Medicare for those claims was approximately $92,913.11.

78.     On August 9, 2021, DHCS Investigator Grumet and I telephonically interviewed Dr. Shah regarding E.A.   The following is a summary of the interview:

      a.     Dr. Shah has been E.A.'s PCP since 2017.   E.A.'s last visit was in April 2021.

      b.     During the interview Dr. Shah reviewed E.A.'s medical records.   Dr. Shah did not have a record of her referring E.A. to hospice services.

      c.     Dr. Shah did not find a record of a hospice referral from any other source in E.A.'s medical record.   Dr. Shah found a note indicating that E.A. was referred to Guardian, a home health agency.

      d.     E.A. does not have cancer or any other type of illness that would qualify E.A. for hospice services.

4.     Medicare Beneficiary M.H. (MERIDIAN)

79.     On July 20, 2021, FBI SA Gayle and DHCS Investigator Grumet interviewed M.H.   The following is a summary of the interview:

      a.     M.H. received hospice services from MERIDIAN.

      b.     M.H. learned about MERIDIAN after someone from MERIDIAN gave a presentation in the building where M.H. lives. Staff came to M.H.'s home during the week regularly to provide hospice services.

      c.     The services were described as palliative care and not end of life care.

      d.     M.H. is not about to die but has medical conditions that, if left untreated, could result in death.

e.    During the visits MERIDIAN staff checked M.H.'s vitals and helped her exercise, take out the trash, and with light housekeeping duties.  M.H. received almost daily visits from a MERIDIAN staff member.

f.    M.H. confirmed that she does not have an end of life diagnosis but suffers from high blood pressure and diabetes.

g.    M.H. has a different caregiver who helps her shower.

80.   According to MERIDIAN's HOSPICE DATA, M.H. was enrolled with MERIDIAN from December 20, 2019 to April 30, 2021, with a diagnosis of cerebral infarction, unspecified.  The total billed by MERIDIAN to Medicare was approximately $116,632.81 and the total paid by Medicare for those claims was approximately $91,873.53.

5.    Medicare Beneficiaries M.B. (MERIDIAN)

81.   On July 29, 2021, FBI SA Gayle and DHCS Investigator Grumet interviewed M.B.  M.B. was identified from a MERIDIAN check with her name written in the memo.  The check was written to CRAIG.  The following is a summary of the interview:

a.    M.B. recalled receiving hospice services from MERIDIAN.  M.B. heard about MERIDIAN when she was in the hospital.  M.B. received hospice services from MERIDIAN for approximately one year.

b.    The MERIDIAN staff helped M.B. around the house, took her blood pressure and temperature.  M.B. was able to shower on her own.

c.    No one explained to M.B. what the term hospice meant.  M.B. does not know if she qualified for hospice services.

d.    M.B. does not have a terminal illness.  M.B.'s primary care physician is Dr. Don Palencia.  Dr. Palencia is listed as the attending physician on the MERIDIAN Medicare claims data.  M.B.'s doctors never told her that she had a specific time to live.

82.    According to MERIDIAN's HOSPICE DATA, M.B. was enrolled with MERIDIAN from April 7, 2020 to April 30, 2021, with a diagnosis of heart disease, unspecified.  The total billed by MERIDIAN to Medicare for M.B. was approximately $88,183.19 and the total paid by Medicare for those claims was approximately $72,288.70.

83.    On September 14, 2021, FBI SA Gayle and DHCS Investigator Grumet telephonically interviewed M.B.'s PCP, Dr. Don Palencia.  The following is a summary of the interview:

a.    M.B. has been under the care of Dr. Palencia since December 2018.

b.    On February 27, 2020, Dr. Palencia visited M.B. at her home for a routine checkup.  Dr. Palencia noted that M.B.'s vitals were good, she was feeling well, and she was stable.

c.    On May 29, 2020, Dr. Palencia went back to M.B.'s home for another routine visit and noticed M.B. had medication that was prescribed by another provider.  Dr. Palencia was surprised to find out M.B. had been placed on hospice with

MERIDIAN in April 2020.  Dr. Palencia was not notified or sent any communication that M.B. was placed on hospice services.  Dr. Palencia stated he never did a hospice evaluation on M.B. and was never asked for a hospice referral.

d.   Dr. Palencia did not understand why M.B. was on hospice.  Hospice was reserved for patients with six months or less to live and M.B. was not at that stage based upon his visits.  Dr. Palencia assumed M.B.'s heart condition worsened, and her cardiologist placed her on hospice services.  Dr. Palencia never gave M.B. a diagnosis of a terminal illness.

e.   Dr. Palencia's last visit with M.B. was on May 29, 2020, because M.B. was placed on hospice.  When a patient goes on hospice, they no longer use their PCPs.  All medical treatment is handled by the hospice medical team.

6.   Medicare Beneficiary D.F. (MERIDIAN)

84.   On July 20, 2021, FBI SA Gayle and DHCS Investigator Grumet interviewed D.F.  The following is a summary of the interview:

a.   D.F. heard about MERIDIAN from her son, who heard about MERIDIAN from his employer.  D.F. suffers from high blood pressure.

b.   MERIDIAN staff assisted her with showering and other needs she had around the house.  MERIDIAN orders D.F.'s medication.

c.   D.F. understands what hospice means but does not know if she has a terminal illness.  A doctor has never told her that she has six months or less to live.

      d.    The name Dr. Chirag Bhavsar, the doctor listed as the attending physician on the MERIDIAN Medicare claims data, sounded familiar.

85.    According to MERIDIAN's HOSPICE DATA, D.F. was enrolled with MERIDIAN from March 23, 2020 to April 30, 2021 (current patient).  D.F. had diagnoses of heart disease, unspecified.  The total billed by MERIDIAN to Medicare for D.F. was approximately $93,755.93 and the total paid by Medicare for those claims was approximately $75,372.86.

      7.   Medi-Cal Beneficiary R.R. (MERIDIAN)

86.    On August 25, 2021, FBI SA Gayle and DHCS Investigator Grumet interviewed R.R.  The following is a summary of the interview:

      a.    R.R. contracted COVID-19 and went to the hospital for treatment.  People at the hospital told her someone would be coming to her home to help take care of her.  R.R. showed agents a folder with the name "Silvia" handwritten on it.  Silvia was the person who helped take care of R.R. for six months.  Silvia helped R.R. bathe.

      b.    R.R. does not have a terminal illness.  She has not been told by a doctor that she has six months or less to live.

87.    According to MERIDIAN's Medi-Cal HOSPICE DATA, R.R. was enrolled with MERIDIAN from January 14, 2021 to May 1, 2021, with a diagnosis of heart disease, unspecified.  The total reimbursement amount to MERIDIAN from Molina, a Medi-Cal managed healthcare plan, for R.R. was approximately $31,859.30.

 8.   Medicare Beneficiary K.P. (A'S)

88.    On June 23, 2021, FBI SA Gayle and I interviewed K.P.
The following is a summary of the interview:

a.   K.P. was introduced to A'S when a white male in
his late 30's or early 40's knocked on her door.  He said he was
a representative from A'S.  K.P. thought hospice was for "when
you were on your last leg."  The representative told her that
she qualified for hospice because the rules had changed.

b.   K.P.'s PCP is Dr. Amy French but the treating
provider is Dr. French's physician assistant, Tiffany Periano.

c.   A'S sent a nurse once a week and an aide came
once a week to bathe and assist K.P. with her household chores.
Around Christmas time, an unknown person who K.P. believed to be
a doctor affiliated with A'S came to see K.P and brought her a
blanket.

d.   K.P was told by the physician assistant during a
visit with her PCP that her office visits were not being covered
because she was on hospice.  The representative from A'S Hospice
told K.P. that she did not have to switch doctors if she
accepted hospice services.  K.P. ended her hospice services so
she could see her primary care physician.

89.    I reviewed Medicare claims data extracted on March 25,
2021 (hereinafter "A'S HOSPICE DATA"), from CMS' Business Objects
– One Program Integrity database.  According to A'S HOSPICE DATA,
K.P. was enrolled with A'S from September 19, 2018 to March 28,
2019, with a diagnosis of chronic obstructive pulmonary disease.
The total billed by A'S to Medicare for K.P. was approximately

$54,323.48 and the total paid for those claims was approximately $35,600.64.

90.    On August 12, 2021, DHCS Investigator Grumet and I telephonically interviewed Tiffany Peraino, the physician's assistant who oversees K.P.'s health care.  The following is a summary of the interview:

      a.    Periano is supervised by Dr. Amy French, K.P's PCP.  Periano reviewed K.P.'s medical records while we were on the phone with her.

      b.    Periano did not order hospice services for K.P. The last time Periano saw K.P was on June 24, 2021.

      c.    Periano specifically reviewed K.P.'s medical record during the time that hospice services were provided.

      d.    Periano treated K.P. on December 5, 2018 regarding a breathing test.  Periano would not discuss a patient having PFT breathing test if the patient was transitioning to hospice.

      e.    Periano treated K.P. on April 24, 2019.  There was no discussion of hospice services.  Periano noted K.P. was "doing well."

      f.    K.P. does suffer from COPD but does not have a terminal illness.  Dr. Michael Molinari is K.P.'s gastro-intestinal doctor and there are no notes in the medical file showing Dr. Molinari referred K.P. for hospice services.

      g.    Periano did not find any documents in K.P.'s medical record from A'S, DOCTORS', or Dr. Thomas Kockinis.

9.   Medicare Beneficiary O.C. (A'S)

91.   On June 23, 2021, FBI SA Gayle and I interviewed O.C. and her daughter L.C.  The following is a summary of the interview:

a.   O.C. was introduced to A'S when she went to a booth in the main lobby of her apartment building that was advertising A'S.  O.C.'s daughter, L.C did not understand why O.C. was being signed up for hospice because she knew that hospice meant you had a terminal illness.  A man told L.C. that they were trying to get more people to sign up for hospice services.  O.C. takes medication for high blood pressure, diabetes, osteoporosis, and her thyroid.

b.   An employee from A'S came to bathe and take O.C.'s blood pressure, although O.C. declined assistance with bathing because she could do it herself.  L.C. identified the employee from A'S as "Craig" and gave investigators a phone number for "Craig" who agents were able to identify as CRAIG. L.C. had CRAIG's name and contact information and indicated CRAIG came by O.C.'s house to check how things were going with the hospice services.  O.C. never spoke to Dr. PATEL or KOCKINIS.

c.   During the interview, L.C. stated, "My mom is strong, can move around on her own, and isn't dying so I told her to end hospice services."

92.   According to A'S HOSPICE DATA, O.C. was enrolled with A'S from September 21, 2018 to January 10, 2019, with a diagnosis of atherosclerotic heart disease of native coronary artery with

unspecified angina pectoris.  The total billed by A'S to Medicare was approximately $27,679.93 and the total paid by Medicare for those claims was approximately $22,076.32.

      10.  <u>Medicare Beneficiary P.S. (A'S)</u>

  93.    On September 8, 2021, FBI SA Gayle and DHCS Investigator Grumet interviewed P.S.  The following is a summary of the interview:

      a.    P.S. learned about A'S Hospice when she saw a flyer in the manager's office of the community, she lives in. P.S. called because the flyer stated something about a person did not need to have a life-threatening condition to qualify. After the call someone came to P.S.'s house to sign her up for services.

      b.    A doctor from A'S met with P.S. in her home and told her that she had congestive heart failure.  P.S. told the doctor that she did not have congestive heart failure.  The doctor reiterated that P.S. did not understand and that she had congestive heart failure.

      c.    P.S. has a pacemaker and had heart valve replacement and a heart murmur.

      d.    P.S.'s current primary care physician, Dr. Lori Seymour, her previous primary care physician, Dr. Melanie Mohlegie, never told her that she suffered from congestive heart failure or a life-threatening illness.

      e.    P.S. understands that hospice is end of life care.

     f.   An A'S employee came to P.S.'s home to take her blood pressure.  At some point, P.S. asked that the staff not come in person and P.S. switched to telephone calls with the A'S staff.

     g.   P.S. stopped the hospice services because she saw how much money A'S was charging and she did not think it was worth it for approximately one call a month.

94.   According to A'S HOSPICE DATA, P.S. was enrolled with A'S from February 5, 2020 to November 20, 2020, with a diagnosis of "unspecified combined systolic (congestive) and diastolic (congestive) heart failure."  The total billed by A'S to Medicare was approximately $69,952.01 and the total paid by Medicare for those claims was approximately $55,601.77.

95.   On October 8, 2021, DHCS Investigator Grumet and I telephonically interviewed Dr. Melanie Mohleji, P.S.'s primary care physician.  The following is a summary of the interview:

     a.   Dr. Mohleji has been P.S.'s primary care physician since late 2019.

     b.   Dr. Mohleji's first and last in-person appointment with P.S. was in December 2019.  This appointment was to establish care.

     c.   Upon review of the file, Dr. Mohleji did not see anything that would indicate that P.S. was diagnosed with six months or less to live or justified hospice services.

     d.   During the time that P.S. was under hospice care by A'S, Dr. Mohleji had three telephone calls with P.S.  The first call was to request a wheelchair ramp, the second call was

to recommend P.S. get a colonoscopy (P.S. refused); and the third call was regarding P.S.'s swelling feet.

     e.   As Dr. Mohleji was reviewing P.S.'s patient file she observed that P.S. was treated by Dr. Tyler Syndergaard while Dr. Mohleji was on leave. On November 17, 2020, P.S. had an in-person visit with Dr. Syndergaard.  During this visit, P.S. told Dr. Syndergaard that she was on hospice.  P.S. indicated that she wanted to continue medical treatment, but Dr. Syndergaard indicated that it was inconsistent with hospice. P.S. indicated that she would follow up with hospice.

   96.   A'S last day of billing for hospice was on November 20, 2021.

### 11.  Medicare Beneficiary E.J. (A'S)

   97.   On June 23, 2021, FBI SA Gayle and I interviewed E.J. The following is a summary of the interview:

     a.   E.J. was introduced to A'S when she signed up for hospice services at a booth in the clubhouse of her senior apartment complex.  A white man in his 40's from A's/DOCTOR'S came to assist her in completing the paperwork.  The name Craig Abbott sounded familiar to E.J. as the man who assisted her.

     b.   E.J. suffers from high blood pressure and arthritis.  E.J. had her left breast removed in 2011, due to breast cancer.

     c.   E.J. never had any doctors come by to see her. She has never heard of KOCKINIS, the attending physician listed on the A'S Medicare claims data.

      d.   E.J. remembered the name DR. PATEL because it was printed in the book that the A'S representative gave her at the initial sign up.

98.   According to A'S' HOSPICE DATA, E.J. was enrolled with A'S from September 19, 2018 to October 2, 2018.  E.J. was diagnosed with malignant neoplasm of unspecified site of unspecified female breast.  The total billed by A'S to Medicare for E.J. was approximately $4,241.28 and the total paid by Medicare for those claims was approximately $3,157.63.

      12.   <u>Interview of K.A. daughter of Medicare Beneficiary J.J. (A'S)</u>

99.   On July 7, 2021, FBI SA Gayle and DHCS Investigator Grumet interviewed K.A. on behalf of her mother J.J.  The following is a summary of the interview:

      a.   K.A. heard about A'S from a friend.  J.J. is diagnosed with Alzheimer's and dementia.  A man whom K.A. believed to be the owner of A'S came to her home with a nurse to evaluate J.J. for hospice services.  They told K.A. that J.J qualified for palliative care.

      b.   K.A. understood that hospice meant end of life care with a person having six months or less to live.  The person whom K.A. believed was the owner explained that A'S offered both hospice and palliative care.

      c.   A'S ended hospice services because J.J. no longer qualified.

      d.   J.J. did not see a doctor associated with DOCTOR'S.

e.   J.J. maintained her primary care physician at Kaiser.

f.   As a part of the hospice services a nurse came to their home once a week and a chaplain came once a month.

100.   On October 6, 2021, DHCS Investigator Grumet and I interviewed Dr. Mary Ruppert.  The following is a summary of the interview:

a.   Dr. Ruppert has been J.J.'s PCP since April 2016. J.J.'s first visit with Dr. Ruppert was on April 5, 2016. During this initial interview J.J. only answered questions with one-word answers and was able to smile.  However, Dr. Ruppert considered J.J.'s dementia advanced.

b.   In February 2018, J.J. was hospitalized with pneumonia and was later discharged to her daughter's home.  Dr. Ruppert saw J.J. in March 2018 and her next visit was to the urgent care in December 2018.  Between March 2018 and December 2018, Dr. Ruppert described J.J. as needing assistance with daily living but not eligible for hospice services.  J.J. was not referred for hospice during this time.

c.   From December 2018 to February 2020, J.J. was seen mostly for follow-up care related to her Alzheimer's disease.  In February 2020, J.J. was seen in the urgent care for a skin rash.  J.J. was not eligible for hospice services and was not referred to hospice at this time.

d.   In September 2021, J.J.'s health had deteriorated to the point that she was referred to hospice services.  J.J.'s

condition had worsened where she was not eating and was losing weight.  J.J. died shortly after entering hospice services.

13.  Medicare Beneficiaries C.B. and M.S.
     (A'S/MERIDIAN)

101.  On September 15, 2021, FBI SA Gayle and I interviewed C.B. and M.S.  The following is a summary of the interview:

a.  C.B. and M.S. live together in a trailer park.

b.  C.B. has never been diagnosed with a terminal illness and has never been told he has six months or less to live.  C.B.'s only ailment is he suffers from diabetes.

c.  M.S. has never been diagnosed with chronic pulmonary heart disease.  She has never been told that she has six months or less to live or been diagnosed with a terminal illness.

d.  C.B. and M.S. do not currently have a primary care physician.  Dr. Shihin, FNU, was their primary care physician approximately four years ago.

e.  C.B. and M.S. did not recognize the names Dr. DR. PATEL and KOCKINIS, the names that were on the prescription medication.

f.  Agents identified folders from A'S and MERIDIAN on the floor in the living room.

102.  According to MERIDIAN'S and A'S HOSPICE DATA, C.B. was enrolled with MERIDIAN from October 10, 2018 to February 27. 2020, with a diagnosis of atherosclerotic heart disease of native coronary artery without angina pectoris.  The total billed by MERIDIAN to Medicare for C.B was approximately $113,121.91 and the

total paid by Medicare for those claims was approximately $90,068.72. Additionally, C.B. was enrolled with A'S from April 7, 2020 to February 28, 2021, with a diagnosis of atherosclerotic heart disease of native coronary artery without angina pectoris. The total billed by A'S to Medicare for C.B was approximately $90,019.51 and the total paid by Medicare for those claims was approximately $58,542.72.

103.    According to MERIDIAN'S and A'S HOSPICE DATA, M.S. was enrolled with MERIDIAN from March 12, 2019 to July 9, 2020, with a diagnosis of chronic obstructive pulmonary disease.  The total billed by MERIDIAN to Medicare for M.S. was approximately $108,076.72 and the total paid by Medicare for those claims was approximately $86,993.89.  Additionally, M.S. was enrolled with A'S from December 6, 2020 to February 26, 2021, with a diagnosis of Chronic Obstructive pulmonary disease, unspecified. The total billed by A'S to Medicare for M.S. was approximately $30,301.67 and the total paid by Medicare for those claims was approximately $21,692.80.

14.    Medi-Cal Beneficiary A.H. (A'S/MERIDIAN)

104.    On August 23, 2021, FBI SA Gayle and DHCS Investigator Grumet interviewed A.H.  The following is a summary of the interview:

        a.    A.H. received hospice services from MERIDIAN and A'S.

        b.    A.H. received hospice services from MERIDIAN for approximately one year.

      c.   A.H. learned about MERIDIAN when a representative gave a presentation at Volunteers of America.  A.H. raised his hand indicating he needed help because he was ill.

      d.   A.H. suffers from back pain, high blood pressure and diabetes.  A.H. is not aware of any tests indicating he has cancer.

      e.   A.H. is "not about to die."

      f.   A MERIDIAN employee helped A.H. with bathing, monitored his pulse and helped with medications.

      g.   Every time A.H. goes to the hospital he is discharged from hospice.  A.H. has been discharged from hospice approximately two or three times because he went to the hospital.

105.  According to A'S Medi-Cal claims DATA, A.H. was enrolled with A'S on approximately April 22, 2020.  The total reimbursement amount to A'S from L.A. Care, a Medi-Cal managed healthcare plan, for A.H. was approximately $1,590.12.

106.  According to MERIDIAN's Medi-Cal HOSPICE DATA, A.H. was enrolled with MERIDIAN from approximately July 1, 2018 to March 1, 2020.  The total reimbursement amount to MERIDIAN from L.A. Care, a Medi-Cal managed healthcare plan, for A.H. was approximately $116,572.58.

## IX.   MEDICARE CLAIMS DATA ANALYSIS

### A.   MERIDIAN

107.  According to MERIDIAN's Hospice Data, MERIDIAN submitted claims to Medicare from March 7, 2018 to September 15, 2021 for claims with dates of service ranging from November 22,

2017 to August 31, 2021.   MERIDIAN billed Medicare for
approximately 250 beneficiaries, totaling approximately 1,549
claims.   MERIDIAN billed Medicare a total of approximately
$9,815,973.38 and was paid by Medicare a total of approximately
$8,134,652.21.

       a.   Analysis of the MERIDIAN and A'S patient data
also shows that many of the hospice beneficiaries are related by
address.   I know from my training and experience that marketers
often recruit patients who live in the same area, such as a
senior living facility, or at senior community centers.   This
often results in many beneficiaries with common addresses.   For
example, I identified six Medicare beneficiaries that received
services from A'S or MERIDIAN who resided at the same senior
living facility.   Another example is there are an additional six
Medicare beneficiaries that were billed for services by A'S and
MERIDIAN who resided in the same trailer park.   Based on my
training and experience, this is indicative of fraud because
marketers will recruit beneficiaries for hospice at the same
address regardless of whether the beneficiaries are terminally
ill.   This practice suggests that beneficiaries are recruited in
groups to maximize hospice referrals.   In my experience it is
unusual for members of the same address to be eligible for
hospice at the same time.

    **B.   A'S**

   108.   According to A'S' Hospice Data, A'S submitted claims
to Medicare from March 8, 2018 to September 28, 2021 for claims
with dates of service ranging from February 9, 2017 to August 31,

2021.  A'S billed Medicare for approximately 247 beneficiaries, totaling approximately 1,349 claims.  A'S billed Medicare a total of approximately $10,089,751.50 and was paid by Medicare a total of approximately $6,821,885.10.

     a.  According to Medicare claims data, KOCKINIS was the attending physician for 247 out of 248 patients or 99.99% of the beneficiaries.  NEHAL PATEL is listed as the attending physician for the remaining patient.

     **C.   DOCTOR'S**

109.   According to DOCTOR'S' Home Health Data, DOCTOR'S submitted claims to Medicare from January 1, 2017 to September 1, 2021, for claims with dates of service paid through August 31, 2021.  DOCTOR'S billed Medicare for approximately 19 beneficiaries, totaling 64 claims.  Medicare paid DOCTOR'S a total of approximately $121,594.89.

     a.  According to Medicare claims data, DR. PATEL was the attending physician for 9 of 19 beneficiaries, or 47.36% of the beneficiaries.

     b.  Analysis of the DOCTOR'S patient data also shows multiple home health beneficiaries share the same address as the beneficiary addresses for MERIDIAN and A'S.   Based on my training and experience, this is indicative of fraud because marketers will recruit beneficiaries for hospice or home health at the same address regardless of whether the beneficiaries meet medical necessity.  This practice suggests that beneficiaries are recruited in groups to maximize referrals.

c.   Based on my training and experience it is common practice for businesses who recruit patients will bill for patients in all their businesses. PATEL also paid the CHS for recruiting a Medicare beneficiary for DOCTOR'S.

**MERIDIAN and A'S and DOCTOR'S**

110.   According to review of the Medicare claims data for all three providers located at the SUBJECT PREMISES, approximately 22 beneficiaries had claims paid by Medicare from two of the providers located at the SUBJECT PREMISES.  Two beneficiaries had claims paid by Medicare for three of provider's located at the SUBJECT PREMISES.

## X.   <u>FINANCIAL ANALYSIS</u>

**A.   MERIDIAN Bank**

111.   MERIDIAN BANK account ending in 5598 was opened on or about May 18, 2016 in the name of "Meridian Hospice Care Inc." PATEL was listed on the signature card as the Sole Owner and the sole signor.  According to PECOS, PATEL is listed as the only person having "5% or Greater Direct Ownership Interest" in MERIDIAN's as of April 27, 2016.

**B.   A'S Bank 1**

112.   A'S bank account 1, ending in 4941, (hereinafter "A'S BANK 1") was opened on or about December 7, 2013.  Beginning on or about April 17, 2015, PATEL became the sole signator on the account.  According to PECOS, PATEL is listed as the only person having "5% or Greater Direct Ownership Interest" in A'S as of May 15, 2015.

    **C.   A'S Bank 2**

113.   A's bank account 2, ending in 1527, (hereinafter "A'S BANK 2") was opened on or about September 12, 2017.  The business listed on the account is "A's Hospice dba Doctors Hospice Southern CA."  Gordhan M. Patel is listed as the "Owner with Control of the Entity".

    **D.   A'S Bank 3**

114.   A'S BANK 3 ending in 1613 was opened on July 9, 2013. PATEL is listed as the only owner of the account.  Since on or about April 17, 2015, PATEL has been the sole signator on the account.  Since on or before March 6, 2017, "Doctor's Hospice of Southern California" has been an "Associated Party."  According to PECOS, PATEL is listed as the only person having "5% or Greater Direct Ownership Interest" in A's as of May 15, 2015.

    **E.   DOCTOR'S Bank**

115.   DOCTOR'S BANK account ending in 5867 was opened on March 6, 2017.  PATEL is list as the sole owner of the account. The business listed on the account is "Doctors Home Health Southern California, Inc."  PATEL is listed as the only person with a ""5% or Greater Direct Ownership Interest" of DOCTOR'S as of January 10, 2017.

    **E.   Payments to Patient Marketers**

116.   Based on a review of MERIDIAN BANK 1, A'S BANK 1, A'S BANK 2 and A'S BANK 3 collectively, PATELS' bank accounts, the companies were engaged in paying kickbacks to marketers in exchange for patient referrals.  Based on my training and experience, I am aware that paying kickbacks to marketers is a

common technique used by fraudulent hospice providers when engaging in health care fraud.  Through interviews of Medicare and Medi-Cal beneficiaries and corroborated by a review of the PATEL'S BANK ACCOUNTS, CRAIG was identified as a marketer and source of patient referrals.

117.  Fifty-four outgoing checks from MERIDIAN BANK 1, totaling $163,129.77, payable to CRAIG, were posted to MERIDIAN BANK 1 between July 28, 2018 and March 12, 2021.  Payment amounts ranged between $750 and $12,650.00.  Many of the checks memo's indicate patients' names followed by dates.  A review of the Medicare claims data shows the dates correspond with the dates of service for the specific patient listed.  Below is a list of examples:

a.  A check written to CRAIG from account MERIDIAN BANK 1, identified as a MERIDIAN checking account bearing checking number 2250, dated April 15, 2020, contained the name M.B. in the memo line followed by a notation "SOC 04/07/20."[14] The amount of the check was $750.00.  M.B. is a Medicare beneficiary who had multiple claims submitted to Medicare by MERIDIAN including the date range April 7, 2020 to April 30, 2020.

b.  A check written to CRAIG from MERIDIAN BANK 1, identified as a MERIDIAN checking account bearing checking number 2206, dated April 20, 2020, with the name D.F. in the memo line followed by a notation "3/23" and the name R.G. followed by a notation "3/26."  The amount of the check was

---

[14] As noted above "SOC," is abbreviated for start of care.

$1,500.00.  D.F. and R.G. are Medicare beneficiaries who had
multiple claims submitted to Medicare by MERIDIAN including the
date range March 23, 2020 to March 31, 2020 for D.F. and March
26, 2020 to March 31, 2020 for R.G.

       c.    A check written to CRAIG from MERIDIAN BANK 1,
identified as a MERIDIAN checking account bearing checking
number 2250, dated April 15, 2020, with the name M.B. in the
memo line followed by a notation "SOC 04/07/20."  The amount of
the check was $750.00.  M.B. is Medicare beneficiary who had
multiple claims submitted to Medicare by MERIDIAN including the
date range April 7, 2020 to April 30, 2020.

    118.   Twenty-two outgoing checks from A'S BANK 1, totaling
$51,500, payable to CRAIG, were posted to the A'S Bank Account 1
between August 18, 2018 and February 12, 2021.  Payment amounts
ranged between $750 and $8,000.00.  A review of the Medicare
claims data shows the dates correspond with the dates of service
for the specific patient listed.  Below is a list of examples:

       a.    A check written to CRAIG from A'S BANK 3,
identified as an A'S checking account bearing checking number
1959, dated July 8, 2019, with the name M.W. in the memo line
followed by a notation "INV NO: 008 1 PT (M.W.) 2/18/19."  The
amount of the check was $1,000.00.  M.W. is a Medicare
beneficiary who had multiple claims submitted to Medicare by
MERIDIAN including the date range March 18, 2019 to March 21,
2019.

A check written to CRAIG from account A'S BANK 3 identified as
an A'S checking account bearing checking number 2518, dated

February 13, 2020, the memo, "Stimson Patricia. 2/5, Sundeck 1/31, Drew A."  The amount of the check was $3,000.  The Medicare beneficiaries all had multiple claims submitted to Medicare by A'S including the date range February 5, 2020 to February 29, 2020 for P.S., and January 31, 2020 to January 31, 2020 for T.S.  Agents were not able to identify "Drew A." in the Medicare claims data.

### XI. <u>PROBABLE CAUSE SUBJECT PREMISES ARE PERMEATED BY FRAUD</u>

119.   Based on all of the information set forth above, and on my training, experience, and consultation with other agents, I believe that the providers located at the SUBJECT PREMISES are permeated by fraud and that all of the records of these businesses are likely to be evidence of criminal activity.  Some of the facts that support this view are:

a.   On recorded conversations, PATEL and his employees admitted to PATEL owning DOCTORS, A'S and MERIDIAN.

b.   Virtually every beneficiary interviewed from MERIDIAN and A'S told agents they were not dying and have never been told any physician that they had a terminal diagnosis or a life expectancy of six months or less.  Accordingly, there were indications of fraud with regard to most, if not all, of the beneficiaries interviewed.

c.   Virtually every interviewed primary care physician of the beneficiaries that received services from MERIDIAN and/or A'S believed their patients were not hospice appropriate.

d.    More than 75% of the beneficiaries interviewed did not have a terminal diagnosis listed on the claims submitted to Medicare by MERIDIAN and A'S.

e.    Collectively, the providers located at the SUBJECT PREMISES billed Medicare approximately over $19,800,000.00 and was paid by Medicare approximately over $15,021,000.00.  Based on my training and experience, and my knowledge of this investigation, these billings are indicative of fraud.  Typically, providers billing for hospice patients do not exhaust the patient's eligibility.  This is because patients are usually on hospice for a short period of time, given that hospice is reserved for patients with terminal illnesses.  In this case, however, most patients were on hospice for a longer-than-typical time, which is reflective of the patients not truly having a terminal illness.  The high billings in this case are thus indicative of fraud, as they were the result of the patients being on hospice for a longer time, i.e., the result of the patients not truly having a terminal illness.

f.    PATEL has made payments to several individuals with beneficiary names listed in the memo line for approximately $390,729.00.  As previously mentioned, PATEL's employee paid the CHS with a check.  The payment was for a referral of a Medicare or Medi-Cal beneficiary.

g.    Collectively, the bank accounts showed disbursements checks approximately $390,729.00.  Based on my knowledge of this investigation and my training and experience, this shows that a high number of patients were referred to the

providers at the SUBJECT PREMIESES and that PATEL paid for those referrals.  PATEL has indicated to CHS that PATEL makes payments to marketers in the form of checks.  As previously mentioned, PATEL paid CHS with a check.  According to Medicare data, the entities located at the SUBJECT PREMISES submitted claims for approximately 485 beneficiaries in the past four years.

## XII.  PROBABLE CAUSE THAT THE ITEMS TO BE SEIZED ARE LOCATED AT THE SUBJECT PREMISES

### A.  Evidence that PATEL's businesses Continues to Operate from the SUBJECT PREMISES

120.  On or about March 27, 2020, a Statement of Information was submitted to the California Secretary of State for A'S Hospice, SUBJECT PREMISES 2.  The Statement of Information listed no change.  The previous Statement of Information filed on or about April 21, 2015, listed the office address for A'S as 14125 Telephone Avenue, Suite 13, Chino, California 91710.

121.  On or about August 10, 2021, a Statement of Information was submitted to the California Secretary of State for MERIDIAN, SUBJECT PREMISES 1.  The Statement of Information listed the office address for MERIDIAN as 5562 Philadelphia Street, Suite 210, Chino, California 91710.  The previous Statement of Information was filed on or about April 27, 2016.

122.  On or about January 10, 2017, a Statement of Information was submitted to the California Secretary of State for DOCTOR'S, SUBJECT PREMISES 3.  The Statement of Information November 2, 2020 shows a change of address to 5562 Philadelphia Street, Suite 216, Chino, CA 91710. The previous Statement of Information filed on or about September 13, 2017, listed the

office address for DOCTOR'S as 14125 Telephone Avenue, Suite 14, Chino, California 91710.

123.  On August 3, 2021, DHCS Investigator Grumet conducted surveillance at 5562 Philadelphia Street, Chino, California.  I reviewed the report and learned the following:

  a.  The marquee located on the first floor lobby of the building located at 5562 Philadelphia Street, Chino, California 91710 shows that MERIDIAN is located in "Suite 210", A'S is located in "Suite 213," and DOCTOR'S is located in "Suite 216."

  b.  On March 10, 2021, the CHS captured an image of the marquee located on in the lobby of the first floor of the building located at 5562 Philadelphia Street, Chino, California 91710 shows that MERIDIAN is located in "Suite 210", A'S is located in "Suite 213," and DOCTOR'S is located in "Suite 216."

  c.  According to the Medicare hospice/home health data, MERIDIAN submitted claims to Medicare as recently as September 15, 2021, A'S submitted claims to Medicare as recently as September 28, 2021, and DOCTOR'S submitted claims to Medicare as recently as August 19, 2021.

124.  On July 8, 2021, CHS visited the SUBJECT PREMISES 1, SUBJECT PREMISES 2, SUBJECT PREMISES 3, and noticed that employees were actively working.

  **B.  Medical Records and Patient Files**

125.  Based on my training, experience, and discussions with other agents and law enforcement officers, I know hospices commonly maintain records relating to patient care, including:

certification forms; daily route sheets; clinical files and patient records; records relating to the preparation of medical records such as partially completed forms, pre-printed forms, pre-signed blank forms, and evidence of the mailing or sharing of such documents with other persons or receipt of such documents; records regarding missing or incomplete medical records such as lists of missing nursing notes and other memoranda, notes, correspondence, e-mails, lists, logs, and ledgers; records of individuals providing services to patients such as nursing assignment spreadsheets, admitted patient lists, and other records identifying the patients and doctors, RNs, LVNs, physical therapists, and others assigned to provide patient services. Further, hospices generally maintain patient records for several years at their business locations so that they may be easily accessed for billing and payment purposes.  Based on my familiarity with Medicare regulations, I also know that hospices that submit claims electronically, like MERIDIAN and A'S, are required to retain patient records for more than six years after the death or discharge of the patient.

126.   Based on my training and experience, I know that patient files typically include the following:  photocopies of patient identification or benefit cards, physician's orders, patient communication notes, progress notes or notes documenting the patient's medical condition, insurance claim forms, consent forms, and prescriptions, and in the case of patients receiving hospice services, physician certification forms, patient election

of hospice forms, and daily route sheets showing who visited the patient, when the visit occurred, and how long the visit lasted.

127.   Thus, I believe probable cause exists that patient files and other patient care documents related to the businesses identified as the SUBJECT PREMISES alleged provision of services to patients will be found at the SUBJECT PREMISES for the reasons above and for the following reasons:

a.   PATEL admitted to CHS that he owned all the providers located at the SUBJECT PREMISES.

b.   PATEL met with CHS at SUBJECT PREMISES 2 to pay for the referral of a beneficiary enrolled at DOCTORS.  In a prior meeting CHS met with ABBOTT and toured all of the businesses located at the SUBJECT PREMISES.

c.   Several beneficiaries were enrolled at two or more of the providers located at the SUBJECT PREMISES.

C.   **Financial and Business Records**

128.   Based on my training, experience, and discussions with other agents and law enforcement officers, I know that hospices commonly maintain the following types of records at their places of business for several years:

a.   Financial and business records, including personnel and payroll files and records such as employee lists; documents reflecting names, addresses, and durations of employment; pay schedules; tax documents such as W-2s and 1099s; documents recording employees' duties; and documents reflecting reasons for separation or termination from employment of employees, independent contractors, or other individuals paid by

68

the company.  Employee records also commonly include work
schedules, time sheets, appointment books, skilled nursing
notes, and other records showing the services provided by and
all payments to or for doctors, RNs, LVNs, physical therapists,
and other persons providing services to Medicare patients for
the company.

          b.   Other financial and accounting records such as
bank and brokerage account statements, opening applications and
signatory records, check registers, checks and cancelled checks,
deposit tickets and records, financial instruments, money
transmittal receipts and wire transfers, balance sheets, income
or profit/loss statements and related work papers, trial
balances, general journals and general ledgers, subsidiary
journals and ledgers, cash receipts and disbursement journals
and ledgers, expense accounts, loan documents, and notes and
other financial agreements related to the business.

     129.  Based on my training, experience, and discussions with
other agents and law enforcement officers, I know that hospices
also keep records of contracts with consultants, nursing
registries, physical therapy groups, and others providing
services; invoices from and records of payments to such entities;
and supporting documentation for such invoices and payments.

     130.  Based on my review of the recordings of CHS and a
review of MERIDIAN and A'S and DOCTOR'S bank records, I also know
that PATEL paid marketers and/or patients to recruit Medicare
patients.  For that reason, I believe contracts, agreements, or
documents referencing written or verbal contracts with marketers

69

or other patient referral sources, as well as memoranda, notes, correspondence, lists, logs, ledgers, or other records reflecting payments made, in cash or in kind, or other consideration given to marketers or other patient referral sources; cash; and memoranda, notes, correspondence, lists, logs, ledgers and other records reflecting payments made, in cash or kind, or consideration given to any Medicare beneficiary by MERIDIAN, A'S and DOCTOR'S, will be found at SUBJECT PREMISES.

131.   Many of the SUBJECT PREMISES business records, particularly those relating to marketers, may still be useful to the ongoing operations.  Thus, I believe Medicare patient eligibility verification logs; lists of marketers and other referral sources; lists of patients identifying the referral source of any Medicare beneficiary; and memoranda, notes, correspondence, e-mails, lists, logs, ledgers, and other records identifying the referral source of any Medicare beneficiary will be found at the SUBJECT PREMISES.

132.   Accordingly, there is probable cause that records relating to marketers, payments to marketers, lists of patients, and other financial and business records for MERIDIAN, A'S and DOCTOR'S will be found at the SUBJECT PREMISES for the reasons above and for the following reasons:

a.   PATEL admitted to CHS that he owned all of the providers located at the SUBJECT PREMISES.

b.   PATEL met with CHS at the provider located at the SUBJECT PREMISES 2 to pay for the referral of a beneficiary enrolled at DOCTOR'S.

70

c.     Several beneficiaries were enrolled at two or more of the businesses located at the SUBJECT PREMISES.

**D.     Records Related to Medicare Billing**

133.    Based on my training and experience, and discussions with other agents and law enforcement officers, I know that Medicare providers that do their own billing typically generate materials related to how services should be billed in order for the claims to be submitted.  Thus, I believe that records relating to Medicare billing, including Medicare billing and payment files; supporting documentation; correspondence with Medicare or any Medicare contractor; correspondence and communications with billing services, consultants, advisors, and other persons about the proper preparation and submission of claims; and billing manuals, bulletins, newsletters, articles, notices, memoranda, lists of procedure codes, price sheets, copies of rules or regulations, and instructions or directions related to billing Medicare and other documentation related to the proper preparation and submission of claims to Medicare for DOCTOR'S, A'S and MERIDIAN will be found at the SUBJECT PREMISES, for the reasons above and for the following reasons:

a.     PATEL admitted to CHS that he owned all of businesses located at the SUBJECT PREMISES.

b.     PATEL met with CHS at the SUBJECT PREMISES 2 to pay for the referral of a beneficiary enrolled at DOCTOR'S.

c.     Several beneficiaries were enrolled at two or more of SUBJECT PREMISESS.

**E.    Storage of Records and Documents**

134.   Based upon my training, experience, and information
related to me by agents and others involved in the forensic
examination of computers, I know that hospices commonly maintain
medical records, patient information and files, and business and
financial records in electronic format.  Further, electronic data
can be stored on a variety of systems and storage devices
including hard disk drives, floppy disks, compact disks, magnetic
tapes and memory chips.  Additionally, based on my training and
experience, it is common for patient files and records to be
transported in vehicles.  Additionally, based on my training and
experience individuals commonly have cellular telephones located
on their person and/or in their vehicle.

**F.    Procedures to Minimize Disruption of Patients'
       Legitimate Medical Needs**

135.   As noted above, this investigation has revealed
evidence that the provider's located at the SUBJECT PREMISES have
provided medically unnecessary hospice services from at least 2017
to the present, and that evidence of these offenses will be found
at the SUBJECT PREMISES.  To minimize disruption to any legitimate
medical needs of patients, the seizing agents will implement
procedures set forth in Attachment C, which is incorporated herein
by reference.  The procedure provides, upon written request from a
patient, the government will provide to such patient within 48
hours (excluding weekends and holidays) a copy of any medical
treatment information it has seized regarding that patient.

## XIII.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[15]

136.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

_____

[15] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

137.   Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons, including
the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

138.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

139.   As set forth above, the SUBJECT PREMISES are hospice office locations that use digital devices to maintain and store electronic documents containing patient's Protected Health Information[16] ("PHI").  I know, based on my training and experience, that, in order to protect PHI from unauthorized disclosure, hospices employees are not allowed to permit anyone, without proper authorization under HIPPA, to access the electronic records containing PHI of the hospice's patients.  In my training and experience, digital devices found in hospices like the SUBJECT

---

[16] The Standards for Privacy of Individually Identifiable Health Information ("Privacy Rule") establishes a set of national standards for the protection of certain health information.  HHS issued the Privacy Rule to implement the requirement of the HIPAA.

The Privacy Rule protects all "individually identifiable health information" held or transmitted by a covered entity or its business associate, in any form or media, whether electronic, paper, or oral. The Privacy Rule calls this information PHI.

PREMISES may not have a clearly identifiable user based on the exterior of the device and/or may have multiple users whose biometric features may unlock the devices because hospices generally share electronic documents containing patient's PHI to coordinate care with other hospice employees and/or other healthcare providers.  Thus, if while executing the warrant, law enforcement personnel encounter a digital device within the scope of the warrant that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, with respect to every person who is located at the SUBJECT PREMISES during the execution of the search: (1) depress the person's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of the face of the person with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

140.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## XIV. <u>CONCLUSION</u>

141.   For all the reasons described above, there is probable cause to believe the items to be seized described in Attachments B-1, B-2, B-3, and B-4 which constitute evidence and instrumentalities of violations of Title 18, United States Code, Section 1349 (Conspiracy); Title 18, United States Code, Section 1347 (Health Care Fraud); Title 42, United States Code, Section 1320a-7b (Illegal Remunerations for Health Care Referrals); and Title 18, United States Code, Section 1956 (Laundering of Monetary

Instruments), will be found at SUBJECT PREMISES 1, SUBJECT

PREMISES 2, and SUBJECT PREMISES 3, which are described in

Attachments A-1, A-2, and A-3, and on the persons and in SUBJECT

VEHICLE 1 and SUBJECT VEHICLE 2, which are described in

Attachments A-4, A-5, and A-6.


_____
SINA SILVEY, Special Agent
Department of Health and Human
Services, Office of Inspector
General


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone this _____th day of
November, 2021.


_____
HONORABLE KAREN E. SCOTT
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A-1

I.  **PREMISES TO BE SEARCH**

The premises located at 5562 Philadelphia Street, Suite 210, Chino, California ("SUBJECT PREMISES 1").  SUBJECT PREMISES 1 is the office of Meridian Hospice Care, Inc. ("MERIDIAN") and includes offices, safes, containers, and other parts therein, as well as any patio, porch, balcony, or any garage, carport, or storage room associated with or assigned to MERIDIAN.  SUBJECT PREMISES 1 is further described as Suite 210 located inside the building located at 5562 Philadelphia Street, Chino, California, which is a multi-story commercial building that is located on the northwest corner of the intersection of Central Avenue and Philadelphia Street. SUBJECT PREMISES 1 is located on the second floor of the building.  The entrance is located on the northwest side and a gold placard is located on the door of SUBJECT PREMISES 1 reads "Meridian Hospice Care, Inc."

**ATTACHMENT A-2**

I.   <u>**PREMISES TO BE SEARCH**</u>

The premises located at 5562 Philadelphia Street, Suite 213, Chino, California ("SUBJECT PREMISES 2").  SUBJECT PREMISES 2 is the office of A's Hospice dba Doctor's Hospice of Southern California, Inc. ("A'S") and includes offices, safes, containers, and other parts therein, as well as any patio, porch, balcony, or any garage, carport, or storage room associated with or assigned to A'S.  SUBJECT PREMISES 2 is further described as Suite 213 located inside the building located at 5562 Philadelphia Street, Chino, California, which is a multi-story commercial building that is located on the northwest corner of the intersection of Central Avenue and Philadelphia Street.  SUBJECT PREMISES 2 is located on the second floor of the building.  The entrance is located on the northeast side of the building and a gold placard is located on the door of SUBJECT PREMISES 2 reads "Doctors Hospice Southern California."

## ATTACHMENT A-3

### I. PREMISES TO BE SEARCH

The premises located at 5562 Philadelphia Street, Suite 216, Chino, California ("SUBJECT PREMISES 3"). SUBJECT PREMISES 3 is the office of Doctor's Home Health of Southern California, Inc. ("DOCTOR'S") and includes offices, safes, containers, and other parts therein, as well as any patio, porch, balcony, or any garage, carport, or storage room associated with or assigned to DOCTOR'S. SUBJECT PREMISES 3 is further described as Suite 216 located inside the building located at 5562 Philadelphia Street, Chino, California, which is a multi-story commercial building that is located on the northwest corner of the intersection of Central Avenue and Philadelphia Street. SUBJECT PREMISES 3 is located on the second floor of the building. The entrance is located on the northwest side and a gold placard is located on the door of SUBJECT PREMISES 3 reads "Doctors Home Health Southern California, Inc."

**ATTACHMENT A-4**

I.   **PERSON TO BE SEARCHED**

SUBJECT PERSON 1 is Gordhan Patel, including any items that he
is possessing and/or controlling at the time of the execution of
the warrant.  SUBJECT PERSON 1 includes items in PATEL'S pockets
or hands (like digital devices or briefcases) or on PATEL's back
(like a backpack) at the time of the execution of the warrant.


According to a DMV record obtained on November 3, 2021, PATEL
resides at 16522 Murphy Road, La Mirada, California 90638.
According to the DMV record, PATEL has black hair and black
eyes; his height is 5-7 and weight is 168 pounds.  A photo from
the DMV record is below:



<u>**ATTACHMENT A-5**</u>

I.   <u>**VEHICLE AND PERSON TO BE SEARCHED**</u>

SUBJECT VEHICLE 1 is a 2021 Honda 4 door sedan with California License Plate 8UGP695 and Vehicle Identification Number IHGCV2F93MAO07168, including any items or containers within the vehicle and/or the vehicle's trunk at the time of the execution of the warrant.  On November 3, 2021, a California Department of Motor Vehicle records check showed that the registered owner was Craig Jeffrey Abbott or Felisa Ann Abbott.

SUBJECT PERSON 2 is Felisa Ann Abbott, including any items that she is possessing and/or controlling at the time of the execution of the warrant.  SUBJECT PERSON 2 includes items in ABBOTT'S pockets or hands (like digital devices or briefcases) or on ABBOTT's back (like a backpack) at the time of the execution of the warrant.

According to a DMV record obtained on November 3, 2021, ABBOTT resides at 1054 Winthrop Drive, Corona, California 92882. According to the DMV record, ABBOTT has brown hair and brown eyes; his height is 5-5 and weight is 180 pounds.  A photo from the DMV record is below:



**ATTACHMENT A-6**

I.    VEHICLE AND PERSON TO BE SEARCHED

SUBJECT VEHICLE 2 is a 2006 Lexus 4 door sedan with California License Plate 8LPY979 and Vehicle Identification Number JTHBK262065015440, including any items or containers within the vehicle and/or the vehicle's trunk at the time of the execution of the warrant.  On November 3, 2021, a California Department of Motor Vehicle records check showed that the registered owner was Jackielyn Clemente and Brenden Clemente.

SUBJECT PERSON 3 is Jackielyn Clemente, (JACKIE) including any items that she is possessing and/or controlling at the time of the execution of the warrant.  SUBJECT PERSON 3 includes items in JACKIE'S pockets or hands (like digital devices or briefcases) or on JACKIE's back (like a backpack) at the time of the execution of the warrant.

According to a DMV record obtained on November 3, 2021, JACKIE resides at 14821 Dunton Drive, Whittier, California 90604.  According to the DMV record, JACKIE has black hair and brown eyes; his height is 4-11 and weight is 112 pounds.  A photo from the DMV record is below:



**ATTACHMENT B-1**

I.  **ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband,
fruits, or instrumentalities of violations of 18 U.S.C. § 1349
(Conspiracy to Commit Health Care Fraud); 18 U.S.C. § 1347
(Health Care Fraud); 42 U.S.C. § 1320a-7b (Illegal Remunerations
for Health Care Referrals); 18 U.S.C. § 371 (Conspiracy); and 18
U.S.C. § 1956 (Laundering of Monetary Instruments) collectively,
"the Subject Offenses"), namely:

      a.   For the time period beginning August 1, 2016, and
continuing to the present:

           i.     Clinical files and patient records for all
Medicare and/or Medi-Cal patients.

           ii.    Records showing the preparation of medical
records, such as daily route sheets, partially completed forms,
pre-printed forms, pre-signed blank forms, and evidence of the
mailing or sharing of such documents with other persons or
receipt of such documents from other persons for Medicare
patients.

           iii.   Medicare and/or Medi-Cal billing and payment
files and supporting documentation.

           iv.    Correspondence with Medicare and/or Medi-Cal
or any Medicare and/or Medi-Cal contractor related to Medicare
and/or Medi-Cal patients or Medicare and/or Medi-Cal billing;
correspondence and communications with billing services,
consultants, advisors, and other persons about the proper

i

preparation and submission of claims or supporting documentation to Medicare and/or Medi-Cal; and billing manuals, bulletins, newsletters, articles, notices, memoranda, lists of procedure codes, price sheets, copies of rules or regulations, and instructions or directions relating to billing Medicare and/or Medi-Cal.

v.     Personnel and payroll files and records, employee lists, documents reflecting names, addresses, duration of employment, pay schedules, W-2s, 1099s, duties, and reasons for separation or termination from employment of employees, independent contractors, or other individuals paid by Meridian Hospice Care, Inc. ("MERIDIAN").

vi.     Medicare and/or Medi-Cal patient eligibility verification logs; lists of marketers and other referral sources; time cards and route sheets; lists of patients identifying the referral source of any Medicare and/or Medi-Cal beneficiary; and memoranda, notes, correspondence, e-mails, lists, logs, ledgers and other records identifying the referral source of any Medicare beneficiary.

vii.     Any contracts, agreements, or documents referencing written or verbal contracts with marketers or other patient referral sources.

viii.     Any memoranda, notes, correspondence, lists, logs, ledgers or other records reflecting payments made, in cash or in kind, or other consideration given to marketers or other patient referral sources.

ix.     Cash in amounts greater than $500.

ii

x.      Memoranda, notes, correspondence, lists, logs, ledgers, and other records reflecting payments made, in cash or in kind, or consideration given to any Medicare and/or Medi-Cal beneficiary.

xi.     Contracts with medical clinics, consultants, home health agencies ("HHAs"), pharmacies, and others providing services under arrangement; invoices from and records of payment to such entities; and supporting documentation for such invoices and payments.

xii.    Invoices, payments for services, contracts, and any professional service agreements purportedly provided to or by any consulting or professional service companies including but not limited to:  Dr. Nehal Patel, Dr. Thomas Kockinis, Craig Abbott, and others.

xiii.   Bank and brokerage account statements, opening applications and signatory records, check registers, checks and cancelled checks, deposit tickets and records, financial instruments, money transmittal receipts, and wire transfers for Even or the owners or officers of MERIDIAN.

xiv.    Financial and accounting records, such as balance sheets, income or profit/loss statements and related work papers, trial balances, general journals and general ledgers, all subsidiary journals and ledgers, cash receipts and disbursement journals and ledgers, expense accounts, loan documents, notes, and financial agreements.

xv.     Records of any inspection, review, audit, or inquiry by Safeguard Services ("SGS"), any other Medicare

iii

contractor, and memoranda notes, correspondence, and e-mails concerning any such inspection, review, audit, or inquiry.

　　　　b.　Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

　　　　c.　With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

　　　　　　i.　evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

　　　　　　ii.　evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

　　　　　　iii. evidence of the attachment of other devices;

　　　　　　iv.　evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

　　　　　　v.　evidence of the times the device was used;

　　　　　　vi.　passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and

connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

II.  **SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and

attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

        ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

        c.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

        d.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

        e.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

        f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the

other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.   During the execution of this search warrant, law enforcement is permitted to: (1) depress Gordhan Patel, Lisa Abbott or Jackielyn Clemente thumbs and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific fingers and/or thumbs shall be depressed; and (2) hold the device in front of Gordhan Patel, Lisa Abbott or Jackielyn Clemente face with his or her eyes open

ix

to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**ATTACHMENT B-2**

I.  **ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 1349 (Conspiracy to Commit Health Care Fraud); 18 U.S.C. § 1347 (Health Care Fraud); 42 U.S.C. § 1320a-7b (Illegal Remunerations for Health Care Referrals); 18 U.S.C. § 371 (Conspiracy); and 18 U.S.C. § 1956 (Laundering of Monetary Instruments) (collectively, "the Subject Offenses"), namely:

a.    For the time period beginning July 22, 2016, and continuing to the present:

i.    Clinical files and patient records for all Medicare and/or Medi-Cal patients.

ii.    Records showing the preparation of medical records, such as daily route sheets, partially completed forms, pre-printed forms, pre-signed blank forms, and evidence of the mailing or sharing of such documents with other persons or receipt of such documents from other persons for Medicare patients.

iii.    Medicare and/or Medi-Cal billing and payment files and supporting documentation.

iv.    Correspondence with Medicare and/or Medi-Cal or any Medicare and/or Medi-Cal contractor related to Medicare and/or Medi-Cal patients or Medicare and/or Medi-Cal billing; correspondence and communications with billing services, consultants, advisors, and other persons about the proper

i

preparation and submission of claims or supporting documentation to Medicare and/or Medi-Cal; and billing manuals, bulletins, newsletters, articles, notices, memoranda, lists of procedure codes, price sheets, copies of rules or regulations, and instructions or directions relating to billing Medicare and/or Medi-Cal.

        v.     Personnel and payroll files and records, employee lists, documents reflecting names, addresses, duration of employment, pay schedules, W-2s, 1099s, duties, and reasons for separation or termination from employment of employees, independent contractors, or other individuals paid by A's Hospice doing business as Doctor's Hospice of Southern California ("A'S").

        vi.    Medicare and/or Medi-Cal patient eligibility verification logs; lists of marketers and other referral sources; time cards and route sheets; lists of patients identifying the referral source of any Medicare and/or Medi-Cal beneficiary; and memoranda, notes, correspondence, e-mails, lists, logs, ledgers and other records identifying the referral source of any Medicare beneficiary.

        vii.   Any contracts, agreements, or documents referencing written or verbal contracts with marketers or other patient referral sources.

        viii.  Any memoranda, notes, correspondence, lists, logs, ledgers or other records reflecting payments made, in cash or in kind, or other consideration given to marketers or other patient referral sources.

ix.     Cash in amounts greater than $500.

x.     Memoranda, notes, correspondence, lists, logs, ledgers, and other records reflecting payments made, in cash or in kind, or consideration given to any Medicare and/or Medi-Cal beneficiary.

xi.     Contracts with medical clinics, consultants, home health agencies ("HHAs"), pharmacies, and others providing services under arrangement; invoices from and records of payment to such entities; and supporting documentation for such invoices and payments.

xii.     Invoices, payments for services, contracts, and any professional service agreements purportedly provided to or by any consulting or professional service companies including but not limited to:  Dr. Nehal Patel, Dr. Thomas Kockinis, Craig Abbott, and others.

xiii.     Bank and brokerage account statements, opening applications and signatory records, check registers, checks and cancelled checks, deposit tickets and records, financial instruments, money transmittal receipts, and wire transfers for Even or the owners or officers of A'S.

xiv.     Financial and accounting records, such as balance sheets, income or profit/loss statements and related work papers, trial balances, general journals and general ledgers, all subsidiary journals and ledgers, cash receipts and disbursement journals and ledgers, expense accounts, loan documents, notes, and financial agreements.

xv.    Records of any inspection, review, audit, or inquiry by Safeguard Services ("SGS"), any other Medicare contractor, and memoranda notes, correspondence, and e-mails concerning any such inspection, review, audit, or inquiry.

b.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

c.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.    evidence of the times the device was used;

iv

              vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

              vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

              viii.    records of or information about Internet Protocol addresses used by the device;

              ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

    3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output

devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

II.  **SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.    In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of

vi

the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

        ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

        c.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

        d.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

        e.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

        f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling

within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.    During the execution of this search warrant, law enforcement is permitted to: (1) depress Gordhan Patel, Lisa Abbott or Jackielyn Clemente's thumbs and/or fingers onto the fingerprint sensor of the device (only when the device has such

ix

a sensor), and direct which specific fingers and/or thumbs shall be depressed; and (2) hold the device in front of Gordhan Patel, Lisa Abbott or Jackielyn Clemente's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**ATTACHMENT B-3**

I.   **ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 1349 (Conspiracy to Commit Health Care Fraud); 18 U.S.C. § 1347 (Health Care Fraud); 42 U.S.C. § 1320a-7b (Illegal Remunerations for Health Care Referrals); 18 U.S.C. § 371 (Conspiracy); 18 U.S.C. § 1956 (Laundering of Monetary Instruments) (collectively, "the Subject Offenses"), namely:

a.   For the time period beginning October 15, 2019, and continuing to the present:

i.    Clinical files and patient records for all Medicare and/or Medi-Cal patients.

ii.    Records showing the preparation of medical records, such as daily route sheets, partially completed forms, pre-printed forms, pre-signed blank forms, and evidence of the mailing or sharing of such documents with other persons or receipt of such documents from other persons for Medicare and/or Medi-Cal patients.

iii.    Medicare and/or Medi-Cal billing and payment files and supporting documentation.

iv.    Correspondence with Medicare and/or Medi-Cal or any Medicare and/or Medi-Cal contractor related to Medicare and/or Medi-Cal patients or Medicare and/or Medi-Cal billing; correspondence and communications with billing services, consultants, advisors, and other persons about the proper

i

preparation and submission of claims or supporting documentation to Medicare and/or Medi-Cal; and billing manuals, bulletins, newsletters, articles, notices, memoranda, lists of procedure codes, price sheets, copies of rules or regulations, and instructions or directions relating to billing Medicare and/or Medi-Cal.

      v.    Personnel and payroll files and records, employee lists, documents reflecting names, addresses, duration of employment, pay schedules, W-2s, 1099s, duties, and reasons for separation or termination from employment of employees, independent contractors, or other individuals paid by Doctor's Home Health of Southern California, Inc. ("DOCTORS").

      vi.    Medicare and/or Medi-Cal patient eligibility verification logs; lists of marketers and other referral sources; time cards and route sheets; lists of patients identifying the referral source of any Medicare and/or Medi-Cal beneficiary; and memoranda, notes, correspondence, e-mails, lists, logs, ledgers and other records identifying the referral source of any Medicare beneficiary.

      vii.    Any contracts, agreements, or documents referencing written or verbal contracts with marketers or other patient referral sources.

      viii.    Any memoranda, notes, correspondence, lists, logs, ledgers or other records reflecting payments made, in cash or in kind, or other consideration given to marketers or other patient referral sources.

      ix.    Cash in amounts greater than $500.

x.      Memoranda, notes, correspondence, lists, logs, ledgers, and other records reflecting payments made, in cash or in kind, or consideration given to any Medicare and/or Medi-Cal beneficiary.

xi.      Contracts with medical clinics, consultants, home health agencies ("HHAs"), pharmacies, and others providing services under arrangement; invoices from and records of payment to such entities; and supporting documentation for such invoices and payments.

xii.      Invoices, payments for services, contracts, and any professional service agreements purportedly provided to or by any consulting or professional service companies including but not limited to:  Dr. Nehal Patel, Dr. Thomas Kockinis, Craig Abbott, and others.

xiii.      Bank and brokerage account statements, opening applications and signatory records, check registers, checks and cancelled checks, deposit tickets and records, financial instruments, money transmittal receipts, and wire transfers for Even or the owners or officers of DOCTOR'S.

xiv.      Financial and accounting records, such as balance sheets, income or profit/loss statements and related work papers, trial balances, general journals and general ledgers, all subsidiary journals and ledgers, cash receipts and disbursement journals and ledgers, expense accounts, loan documents, notes, and financial agreements.

xv.      Records of any inspection, review, audit, or inquiry by Safeguard Services ("SGS"), any other Medicare

contractor, and memoranda notes, correspondence, and e-mails concerning any such inspection, review, audit, or inquiry.

      b.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

      c.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

      i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

      ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

      iii. evidence of the attachment of other devices;

      iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

      v.   evidence of the times the device was used;

      vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and

connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

II.  **SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.    In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and

attempt to recover deleted, "hidden," or encrypted data to
determine, pursuant to the search protocols, whether the data
falls within the list of items to be seized.

        ii.  The search team may use tools to exclude
normal operating system files and standard third-party software
that do not need to be searched.

        iii. The search team may use forensic examination
and searching tools, such as "EnCase" and "FTK" (Forensic Tool
Kit), which tools may use hashing and other sophisticated
techniques.

        c.  The search team will not seize contraband or
evidence relating to other crimes outside the scope of the items
to be seized without first obtaining a further warrant to search
for and seize such contraband or evidence.

        d.  If the search determines that a digital device
does not contain any data falling within the list of items to be
seized, the government will, as soon as is practicable, return
the device and delete or destroy all forensic copies thereof.

        e.  If the search determines that a digital device
does contain data falling within the list of items to be seized,
the government may make and retain copies of such data, and may
access such data at any time.

        f.  If the search determines that a digital device is
(1) itself an item to be seized and/or (2) contains data falling
within the list of other items to be seized, the government may
retain the digital device and any forensic copies of the digital
device, but may not access data falling outside the scope of the

other items to be seized (after the time for searching the device has expired) absent further court order.

       g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

       h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

     5.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

     6.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.    During the execution of this search warrant, law enforcement is permitted to: (1) depress Gordhan Patel, Lisa Abbott or Jackielyn Clemente's thumbs and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific fingers and/or thumbs shall be depressed; and (2) hold the device in front of Gordhan Patel, Lisa Abbott or Jackielyn Clemente's face with his or her eyes

open to activate the facial-, iris-, or retina-recognition
feature, in order to gain access to the contents of any such
device.  In depressing a person's thumb or finger onto a device
and in holding a device in front of a person's face, law
enforcement may not use excessive force, as defined in <u>Graham v.
Connor</u>, 490 U.S. 386 (1989); specifically, law enforcement may
use no more than objectively reasonable force in light of the
facts and circumstances confronting them.

8.   The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

## ATTACHMENT B-4

### I.   ITEMS TO BE SEIZED

The items to be seized are evidence, contraband, fruits, or
instrumentalities of violations of 18 U.S.C. § 1349 (Conspiracy
to Commit Health Care Fraud); 18 U.S.C. § 1347 (Health Care
Fraud); 42 U.S.C. § 1320a-7b (Illegal Remunerations for Health
Care Referrals); 18 U.S.C. § 371 (Conspiracy); and 18 U.S.C. §
1956 (Laundering of Monetary Instruments) (collectively, "the
Subject Offenses"), for the time period of August 1, 2016, to
present, namely:

1.   Cell phones associated with Gordhan Patel (Patel),
Felisa Abbott (Abbott) and Jackielyn Clemente (Jackie).

2.   Any digital device which is itself or which contains
evidence, contraband, fruits, or instrumentalities of the
Subject Offenses, and forensic copies thereof.

a.   With respect to any digital device containing
evidence falling within the scope of the foregoing categories of
items to be seized:

i.   evidence of who used, owned, or controlled
the device at the time the things described in this warrant were
created, edited, or deleted, such as logs, registry entries,
configuration files, saved usernames and passwords, documents,
browsing history, user profiles, e-mail, e-mail contacts, chat
and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of
software that would allow others to control the device, such as
viruses, Trojan horses, and other forms of malicious software,

as well as evidence of the presence or absence of security software designed to detect malicious software;

        iii. evidence of the attachment of other devices;

        iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

        v. evidence of the times the device was used;

        vi. passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

        vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

        viii. records of or information about Internet Protocol addresses used by the device;

        ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

3. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

4.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.  SEARCH PROCEDURE FOR DIGITAL DEVICES

5.    In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The

government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be

seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e. If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g. The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h. After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

6. The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to

law enforcement officers and agents, attorneys for the
government, attorney support staff, and technical experts.
Pursuant to this warrant, the investigating agency may deliver a
complete copy of the seized or copied electronic data to the
custody and control of attorneys for the government and their
support staff for their independent review.

      7.    In order to search for data capable of being read or
interpreted by a digital device, law enforcement personnel are
authorized to seize the following items:

        a.    Any digital device capable of being used to
commit, further, or store evidence of the offense(s) listed
above;

        b.    Any equipment used to facilitate the
transmission, creation, display, encoding, or storage of digital
data;

        c.    Any magnetic, electronic, or optical storage
device capable of storing digital data;

        d.    Any documentation, operating logs, or reference
manuals regarding the operation of the digital device or
software used in the digital device;

        e.    Any applications, utility programs, compilers,
interpreters, or other software used to facilitate direct or
indirect communication with the digital device;

        f.    Any physical keys, encryption devices, dongles,
or similar physical items that are necessary to gain access to
the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

8.   During the execution of this search warrant, law enforcement is permitted to: (1) depress Patel, Abbott and Jackie's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of Patel, Abbott or Jackie's face with his/her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

9.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.